UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER:  15-cv-61855-GAYLES/TURNOFF

JAMES L. TURNER,

Plaintiff,

v.

THEODORE V. WELLS, JR. and
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP,

Defendants.

**Oral Argument Requested**

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT
<u>AND MEMORANDUM OF LAW IN SUPPORT</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ..........................................................................................................2

     A.    Plaintiff ..................................................................................................2

     B.    Defendants ............................................................................................4

     C.    The Jonathan Martin Controversy and the Report .......................................4

     D.    Turner's Complaint and the Alleged Defamatory Statements ....................5

ARGUMENT .............................................................................................................................11

THE COMPLAINT FAILS TO STATE A CLAIM..................................................................12

     A.    The Elements of a Defamation Claim.........................................................12

     B.    The Complaint Does Not State a Claim for Defamation. ..........................15

     C.    The Complaint Fails to Allege that Defendants Acted with the Requisite Fault. .........................................................................................21

     D.    The Report Is Subject to a Qualified Privilege That Has Not Been Overcome.................................................................................................30

CONCLUSION..........................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Airlines, Inc.* v. *Geddes*,
    960 So. 2d 830 (Fla. 3d DCA 2007) ....................................................................21

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)...........................................................................................12

*Barry* v. *Time, Inc.*,
    584 F. Supp. 1110 (N.D. Cal. 1984) ........................................................21, 22, 23

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007).............................................................................................12

*Biro* v. *Conde Nast, Inc.*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013)........................................................... passim

*Bose Corp.* v. *Consumers Union*,
    466 U.S. 485 (1984)......................................................................................25, 28

*Brewer* v. *Memphis Publ'g Co.*,
    626 F.2d 1238 (5th Cir. 1980) .............................................................................22

*Briggs* v. *Univ. of Detroit-Mercy*,
    No. 13 Civ. 12583, 2014 WL 1818000 (E.D. Mich. May 7, 2014).......................22

*Broughton* v. *Livingston Indep. Sch. Dist.*,
    No. 08 Civ. 175, 2010 WL 3056862 (E.D. Tex. July 29, 2010)............................13

*Byrd* v. *Hustler Magazine, Inc.*,
    433 So. 2d 593 (Fla. 4th DCA 1983) ..............................................................13, 15

*Casano* v. *WDSU-TV Inc.*,
    464 F.2d 3 (5th Cir. 1972) ...................................................................................27

*Cepeda* v. *Cowles Magazines & Broad., Inc.*,
    392 F.2d 417 (9th Cir. 1968) ...............................................................................22

*Chuy* v. *Phila. Eagles Football Club*,
    431 F. Supp. 254 (E.D. Pa. 1977), *aff'd*, 595 F.2d 1265 (3d Cir. 1979)................22

*Colantonio* v. *Mercy Med. Ctr.*,
    901 N.Y.S.2d 370 (App. Div. 2d Dep't 2010) ......................................................21

*Curtis Publ'g Co.* v. *Butts*,
    388 U.S. 130 (1967)..................................................................22

*Don King Prods., Inc.* v. *Walt Disney Co.*,
    40 So. 3d 40 (Fla. 4th DCA 2010) ...............................................13

*Ello* v. *Singh*,
    531 F. Supp. 2d 552 (S.D.N.Y. 2007)..........................................25

*Evans* v. *Bayer*,
    684 F. Supp. 2d 1365 (S.D. Fla. 2010) .......................................13

*FloTech Inc.* v. *E.I. Du Pont de Nemours & Co.*,
    814 F.2d 775 (1st Cir. 1987) ......................................................30

*Fortson* v. *Colangelo*,
    434 F. Supp. 2d 1369 (S.D. Fla. 2006) .......................................14

*Friedgood* v. *Peters Publ'g Co.*,
    521 So. 2d 236 (Fla. 4th DCA 1988) .....................................23, 24

*Gallo* v. *Princeton Univ.*,
    656 A.2d 1267 (N.J. App. Div. 1995) ..........................................30

*Geisler* v. *Petrocelli*,
    616 F.2d 636 (2d Cir. 1980).................................................15, 17

*Gertz* v. *Robert Welch, Inc.*,
    418 U.S. 323 (1974).....................................................15, 24, 27

*Hakky* v. *Wash. Post Co.*,
    No. 8:09-CV-2406, 2010 WL 2573902 (M.D. Fla. June 24, 2010) .......................................30

*Harder* v. *Sunrise Senior Living, Inc.*,
    No. 2:09-CV-11094, 2009 WL 5171843 (E.D. Mich. Dec. 22, 2009) ...................................21

*Harte-Hanks Comm'ns, Inc.* v. *Connaughton*,
    491 U.S. 657 (1989)...................................................................27

*Hongjin Su* v. *Wu*,
    No. 11 Civ. 37, 2011 WL 1396994 (M.D. Fla. Apr. 13, 2011) .............................19

*Houston Oilers, Inc.* v. *Harris Cnty.*,
    960 F. Supp. 1202 (S.D. Tex. 1997) ...........................................30

*Info. Sys. & Networks Corp.* v. *City of Atl.*,
    281 F.3d 1220 (11th Cir. 2002) ............................................13, 16

*Karp* v. *Miami Herald Publ'g Co.*,
  359 So. 2d 580 (Fla. 3d DCA 1978) .......................................................................12

*Keller* v. *Miami Herald Publ'g Co.*,
  778 F.2d 711 (11th Cir. 1985) ......................................................................14, 16

*Kirch* v. *Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006)...............................................................................15

*Klayman* v. *City Pages*,
  No. 13 Civ. 143, 2015 WL 1546173 (M.D. Fla. Apr. 3, 2015) ......................................21, 25

*Mar-Jac Poultry, Inc.* v. *Katz*,
  773 F. Supp. 2d 103 (D.D.C. 2011) ..........................................................................12

*Marcone* v. *Penthouse Int'l Magazine For Men*,
  754 F.2d 1072 (3d Cir. 1985)...............................................................................22

*Mayfield* v. *NASCAR, Inc.*,
  674 F.3d 369 (4th Cir. 2012) ...............................................................................26

*Melville* v. *Town of Adams*,
  9 F. Supp. 3d 77, 111 (D. Mass. 2014) .....................................................................25

*Mile Marker, Inc.* v. *Petersen Publ'g, L.L.C.*,
  811 So. 2d 841 (Fla. 4th DCA 2002) .............................................................. passim

*Morse* v. *Ripken*,
  707 So. 2d 921 (Fla. 4th DCA 1998) ...................................................................13, 14

*Murray* v. *HuffingtonPost.com, Inc.*,
  21 F. Supp. 3d 879, 889 (S.D. Ohio 2014) ...................................................................16

*N.Y. Times* v. *Sullivan Co.*,
  376 U.S. 254 (1964)...................................................................................15, 19

*Nodar* v. *Galbreath*,
  462 So. 2d 803 (Fla. 1984)................................................................................30

*Ollman* v. *Novak*,
  750 F.2d 970 (D.C. Cir. 1984) .............................................................................18

*Olson* v. *3M Co.*,
  188 Wis.2d 25 (Wis. Ct. App. 1984) .......................................................................30

*Orenstein* v. *Figel*,
  677 F. Supp. 2d 706 (S.D.N.Y. 2009)........................................................................26

iv

*United States ex rel. Osheroff* v. *Humana, Inc.*,
   776 F.3d 805 (11th Cir. 2015) .................................................................2

*Palmisano* v. *Allina Health Sys.*,
   190 F.3d 881 (8th Cir. 1999) ...............................................................30

*Parisi* v. *Sinclair*,
   845 F. Supp. 2d 215 (D.D.C. 2012) ....................................................27

*Porto* v. *Guirgis*,
   659 F. Supp. 2d 597 (S.D.N.Y. 2009)..................................................18

*Rasmussen* v. *Collier Cnty. Publ'g Co.*,
   946 So. 2d 567 (Fla. 2d DCA 2006) ....................................................15

*Richmond* v. *Southwire Co.*,
   980 F.2d 518 (8th Cir. 1992) ...............................................................30

*Riley* v. *Harr*,
   292 F.3d 282 (1st Cir. 2002) ................................................................14

*Seropian* v. *Forman*,
   652 So. 2d 490 (Fla. 4th DCA 1995) ............................................14, 18

*Shay* v. *Walters*,
   702 F.3d 76 (1st Cir. 2012) ............................................................26, 30

*Silvester* v. *Am. Broad. Cos.*,
   650 F. Supp. 766 (S.D. Fla. 1986) ...........................................14, 23, 26

*Smith* v. *Cuban Am. Nat'l Found.*,
   731 So. 2d 702 (Fla. 3d DCA 1999) .............................................12, 13

*Southard* v. *Forbes, Inc.*,
   588 F.2d 140 (5th Cir. 1979) ...............................................................12

*Spelson* v. *CBS, Inc.*,
   581 F. Supp. 1195 (N.D. Ill. 1984) .....................................................14

*Stearns Bank, N.A.* v. *Shiraz Invs., LLC*,
   No. 12 Civ. 313, 2012 WL 3133679 (M.D. Fla. July 31, 2012)...........19

*Stewart* v. *Sun Sentinel Co.*,
   695 So. 2d 360 (Fla. 4th DCA 1997) ...................................................12

*Straitwell* v. *Nat'l Steel Corp.*,
   869 F.2d 248 (4th Cir. 1989) ...............................................................30

*Tamburo* v. *Dworkin*,
   974 F. Supp. 2d 1199 (N.D. Ill. 2013) ..................................................................30

*Time, Inc.* v. *Johnston*,
   448 F.2d 378 (4th Cir. 1971) .................................................................................22

*Underwager* v. *Channel 9 Australia*,
   69 F.3d 361 (9th Cir. 1995) ...................................................................................16

*Vandenburg* v. *Newsweek, Inc.*,
   441 F.2d 378 (5th Cir. 1971) .................................................................................22

*Vilma* v. *Goodell*,
   917 F. Supp. 2d 591 (E. D. La. 2013)....................................................................27

*Woods* v. *Evansville Press Co.*,
   791 F.2d 480 (7th Cir. 1986) .................................................................................16

Defendants respectfully move, pursuant to Rule 12(b)(6), to dismiss plaintiff's complaint (the "Complaint"). In support of that motion, defendants state as follows:

<u>**PRELIMINARY STATEMENT**</u>

Plaintiff's defamation complaint should be dismissed because it is based on true statements of fact and non-actionable opinions supported by fully disclosed true facts.

Plaintiff James L. Turner is the former offensive line coach for the Miami Dolphins, responsible for leading and mentoring the team's offensive linemen, including former starting tackle Jonathan Martin. When Martin left the team in the middle of the 2013 season, the press reported that his sudden departure was the result of persistent bullying and harassment by his teammates. The NFL retained defendants to conduct an investigation into Martin's departure and prepare a written report that, due to the intense public interest, was to be released publicly. After reviewing thousands of documents and text messages, and conducting more than 100 interviews, defendants concluded in their report (the "Report") that Martin had been harassed by three of his fellow offensive linemen.

Although most of the Report has nothing to do with Turner, he alleges that it defames him. These allegations, which misstate what the Report actually says, fail to identify any substantially false statement of fact and are, at most, simply a handful of Turner's differences of opinion about the undisputed facts. Moreover, Turner now concedes that he knowingly provided false statements to defendants to mislead them about the very matters that are the subject of his Complaint. Because Turner's claims seek to challenge the exercise of defendants' First Amendment rights and chill public debate on a matter of widespread interest, they warrant close scrutiny at the motion to dismiss stage, and should be dismissed with prejudice for the reasons discussed below.

## STATEMENT OF FACTS[1]

A.      **Plaintiff**

Turner is well-known in the sports world.  When the Report was issued, Turner was the Miami Dolphins offensive line coach.  (Compl. ¶ 22.)  He previously coached at a number of prestigious college football programs, including Texas A&M University, where he was the offensive line coach from 2008 to 2011.  (*Id.* ¶ 21.)  Before beginning his coaching career, Turner played football at Boston College, where he was team captain in 1987 and played in the Liberty Bowl, Cotton Bowl and Hall of Fame Bowl.  (*Id.* at 6; Compl. ¶ 18.)

As the offensive line coach for the Dolphins, a famous professional football team at the highest level of the sport, Turner's activities were followed by millions of fans and critics.  He has enjoyed — and continues to have — broad access to the media.  Turner encouraged and stimulated that attention by making comments and providing interviews to national and local media regarding his team's performance and prospects, as well as his coaching practices and philosophy.  He has repeatedly been praised and criticized by commentators and others regarding these topics.  (Examples of press reports are attached hereto as Exhibits D–G, J, P.)[2]

Beyond the exposure that came with his prominent positions in football, Turner was the "star" of the seventh season of *Hard Knocks*, an HBO television series that focuses each year on

---

[1]    The facts herein are based on the allegations and documents referenced in the Complaint and matters subject to judicial notice.  We assume for the limited purposes of this motion that the allegations in the Complaint are true, except to the extent they are contradicted by documents referenced in the Complaint or materials subject to judicial notice. *See United States ex rel. Osheroff* v. *Humana, Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).

[2]    The Court can take judicial notice of media coverage offered to show public attention to Turner, which we do not proffer for the truth of the matters asserted. *See, e.g., Id.*  Courts regularly take judicial notice of such materials in determining whether defamation plaintiffs are public figures at the motion to dismiss stage. *See, e.g.*, *Biro* v. *Conde Nast, Inc.*, 963 F. Supp. 2d 255, 270 n.9 (S.D.N.Y. 2013).

an NFL team.  (Exs. H–I.) [3]  The television show followed the Dolphins through their training

camp and preparation for the 2012 season (one of the seasons that is the subject of the portions of

the Report that Turner complains about), using up-close footage of the personal and professional

lives of the team's players, coaches and staff.

The series showcased Turner's coaching style, featuring one-on-one interviews of Turner

and footage of him on the field and in the locker room, including Turner's discussion of and

interactions with Martin, Richie Incognito, John Jerry and Mike Pouncey — the Dolphins

players at the center of the Report.  *Hard Knocks* shows Turner playing to his audience,

attempting to motivate the offensive linemen through vulgar language and crude sexual

innuendo.  For example, in Episode 2, after making a sexual joke, Turner chides the players who

react:  "You got some major fucking problems.  All of yous."  As the camera follows Turner,

who continues to harangue the players, the narrator explains that Turner is a "former US Marine"

— this "leatherneck is leather lunged" — and mentions the "Band of Brothers" mentality Turner

has instilled in the players.

Turner's prominent role in the series generated widespread media coverage, bringing him

a further "measure of fame."  (Ex. F.)  The *Miami Herald* reported that Turner's "blue one-liners

made him a *Hard Knocks* darling."  (Ex. E.)  A commentator on the sports website

Grantland.com said on August 15, 2012:  "In my time around football, I've always found

offensive line coaches to be my favorite guys, and Jim Turner only solidified that last night [on

*Hard Knocks*]."  (Ex. K.)  CBSSports.com wrote on August 14, 2012:  "Offensive line coach Jim

Turner is doing everything he can to give Mike Westhoff a run for his money as 'Apesmell

Insane Coach,' acting like a madman on television and swearing like a sailor.  Don't scream at

---

[3]    We have filed a motion seeking permission to submit a DVD of the entire 2012 *Hard Knocks*
television series, as well as a file of solely those portions of the show featuring Turner.

me, Jim.  I'm complimenting you."  (Ex. L.)  Indeed, just before the show aired, Dolphins Head

Coach Joe Philbin commented that he was "already lining up replacements for (offensive line

coach) Jim Turner because he's going to be the star" of *Hard Knocks*.  (Ex. H.)

**B.     Defendants**

Defendant Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") is a law firm.

(*See* Compl. ¶ 16.)  Defendant Theodore V. Wells, Jr. ("Wells") is a Paul, Weiss partner and a

co-author of the Report.  (*Id.* ¶ 17.)

**C.     The Jonathan Martin Controversy and the Report**

On October 28, 2013, midway through the football season, Jonathan Martin, a starting

tackle for the Miami Dolphins, abruptly walked out of the team's practice facility and checked

himself into a nearby hospital, requesting psychological treatment.  (Report at 1.)  Within days,

"[r]eports emerged that Martin was allegedly the victim of locker room 'bullying' by his

Dolphins teammates, and the story gained national attention."  (Compl. ¶ 32.)  On November 6,

2013, the NFL retained defendants to conduct an investigation and "prepare a Report for the

commissioner," which would be made public to address the public and media interest.  (*Id.* ¶ 33.)

The Report, released on February 14, 2014, runs to 140 pages plus appendices.

Defendants' investigation, conducted by a team of lawyers, took more than three months.  Over

100 people were interviewed (some more than once), including *every* Dolphins player, *every*

member of the coaching staff, and key front office personnel.  (Report at 6–7, 52–53.)

Defendants reviewed a large volume of documents and video recordings, including emails,

player scouting materials, medical and security files, and thousands of text messages.  (*Id.* at 53.)

The Report describes in extensive detail the facts as they were reported to defendants in

interviews and revealed in the documents.  From the beginning, the Report repeatedly makes

clear that its conclusions are the opinions of the investigating attorneys based on those reported

4

facts.  Thus, the Report begins with a summary Background discussion, stating that "[t]he opinions set forth in the findings and conclusions below and elsewhere in the Report are our own."  (*Id.* at 7.)  That is followed by an Executive Summary that — again — announces that the Report's findings and conclusions are defendants' "opinions" based on disclosed and reported facts.  (*Id.* at 9.)  And the ensuing Background section and Factual Summary reiterate that "[t]he Report presents the independent opinions of Mr. Wells and his colleagues."  (*Id.* at 52.)

The Report's central conclusion is that three starters on the Dolphins offensive line — Incognito, Jerry and Pouncey — "engaged in a pattern of harassment directed at not only Martin, but also another young Dolphins offensive lineman" (identified in the Report as Player A and in the Complaint as Player 1), and "a member of the training staff, whom [the Report refers] to as the Assistant Trainer."  (*Id.* at 1.)  The Report states: "Ultimately, we believe that sufficient evidence exists to support a finding that the abusive conduct by Incognito, Jerry and Pouncy was at least a contributing factor to Martin's emotional distress," and that persistent verbal abuse "contributed to his decision to leave the Dolphins on October 28, 2103, though it was not necessarily the only cause."  (*Id.* at 17, 24.)  None of these conclusions concerns Turner.  And while the Complaint attempts to portray defendants as biased against Turner (without any factual basis), the Report actually singles out Turner for praise.  (*Id.* at 115; *see also* Ex. S.)

**D.     Turner's Complaint and the Alleged Defamatory Statements**

Turner's Complaint identifies four categories of purportedly defamatory statements.

**The Alleged Blow-Up Doll Statements.**  The Report details the evidence of abuse by Incognito, Jerry and Pouncey of an offensive lineman designated as Player A (and in the Complaint as Player 1), who "often was called a 'fag' or 'faggot' in a demeaning tone."  (Report at 19.)  Although Player A was "not actually believed to be gay," Incognito acknowledged that he "was spoken to in this manner repeatedly and persistently — he got it 'every day from

everybody, high frequency.'" (*Id.*)  "Player A was routinely touched by Incognito, Jerry and Pouncey in a mockingly suggestive manner, including on his rear end, while being taunted about his supposed homosexuality." (*Id.*)  None of these facts is disputed in the Complaint.

One of the Report's conclusions is that Turner "was aware of the running 'joke' that Player A was gay, and on at least one occasion, he participated in the taunting." (*Id.* at 20.)  As it did for each conclusion, the Report sets forth in detail the facts reported to defendants that support that conclusion:

> Around Christmas 2012, Coach Turner gave the offensive linemen gift bags that included a variety of stocking stuffers.  The gifts included inflatable female dolls for all of the offensive linemen except Player A, who received a male "blow-up" doll.  Martin and another player reported that they were surprised Coach Turner did this; Martin further said that he was offended that Turner had endorsed the humiliating treatment of Player A by participating in it.  Incognito and others agreed that this incident with Coach Turner occurred.  When interviewed, Turner was asked if he gave Player A a male blow-up doll.  He replied, "I can't remember."  We do not believe that Turner forgot this incident, which many others recalled.

(*Id.* at 20; *see also id.* at 45, 80.)

The Complaint does not allege that the Report inaccurately reported any of these *facts* as relayed to defendants nor does it contest the truth of these facts.  Instead, Turner disagrees with the Report's *opinions* about the *appropriateness* of his actions based on these undisputed facts. Turner alleges that "an impartial analysis could only conclude that Turner did not behave inappropriately with respect to [the blow-up doll] incident." (Compl. ¶ 87.)  Turner's "analysis" of whether he acted "appropriately" is based on this explanation: that he gave Player A a male blow-up doll — when he gave every other player a female blow-up doll — not because Player A was "believed to be a homosexual," but because "the joke was that Player [A] did not always have success dating women." (*Id.* ¶ 85.)  But Turner's own opinion about the appropriateness of his behavior does not change the fact that the Report's conclusion is an opinion based on

6

undisputed facts.  Moreover, while Turner accuses defendants of disregarding his explanation, he did not provide it to defendants when he was interviewed.  As the Report notes, Turner flatly *denied* that he even remembered the incident — a denial that defendants correctly disbelieved. (Report at 20.)  Remarkably, the Complaint alleges that defendants were at fault for failing to "discover and analyze" the very information that Turner admits he withheld.  (Compl. ¶ 88.)

The Complaint also faults defendants for failing to report that Player A and others allegedly were not offended by Turner's crude gesture.  (*Id.* ¶ 87.)  But the opinions stated in the Report about Turner's conduct are based on the conduct itself, not on the reactions of Player A or others.  In any event, the Report does not, as the Complaint incorrectly alleges, state "that Player 1 was offended by Turner's gesture."  (*Id.* ¶ 83.)  The Report refers to Player A's reactions to "persistent insults and mocking physical contact" as "unwelcome;" it does not report his reaction to the blow-up doll incident.  (*See* Report at 21.)

**The Alleged "Judas" Statements.**  The Report found that Martin did not tell the Dolphins that he had been abused by his teammates.  (*Id.* at 37–38, 121–23.)  The Report notes: "Martin claimed that there is a general code in football against 'snitching' on fellow players and that he did his best to honor that rule."  (*Id.* at 37.)  "The Dolphins offensive line enforced this general prohibition with their own peculiar rule — the so-called 'Judas' code, which was buttressed by the imposition of fines."  (*Id.*)  After discussing the evidence, the Report notes:

> We accept that the fear of being labeled a "snitch" or a "Judas" played a role in Martin's decision not to report abuse from his teammates.  Martin believed that going to his coaches or other authority figures meant risking ostracism or even retaliation from his fellow linemen.

(*Id.* at 38; *see also id.* at 122.)

Turner alleges two supposedly defamatory statements in connection with these findings: (1) that defendants "falsely accused Turner of *establishing* a 'Judas Code' by which an offensive

7

lineman could be fined and branded a 'Judas' — a reference to the Biblical Judas who betrayed Jesus Christ and meaning, in this context, a traitor or 'snitch' — for criticizing a fellow offensive lineman" (Compl. ¶ 91 (emphasis added); *see also id.* ¶ 92); and (2) that defendants "falsely stated that this fictional 'code' *prevented* Martin from reporting the 'abuse' to which he was allegedly subjected by his teammates." (*Id.* ¶ 92 (emphasis added).) Neither of these allegedly false statements is actually in the Report.

*First*, the Report contains no statement that Turner "establish[ed] a 'Judas Code,'" or had any role in the creation of the offensive line's self-imposed fine system. Rather, the Report notes that such fine systems have been adopted by NFL *players* in accordance with specific permission from the League. (*Id.* at 121.) The Report found that, "[a]round the beginning of the 2013 season, *the Dolphins offensive linemen* established such a system, and began to impose fines on each other for a variety of trivial offenses." (*Id.* (emphasis added).)

As for Turner's awareness of the "Judas" code, the Report states that "[m]ultiple Dolphins offensive linemen were familiar with the 'Judas' concept and told us that Coach Turner had discussed it with them." (*Id.* at 38.) In addition, Chris Mosley, the Dolphins former assistant offensive line coach, "claimed that Turner actually introduced the Judas concept to the offensive linemen." (*Id.*) Despite the statements of these witnesses, Turner unequivocally denied to defendants knowing anything about use of the term "Judas" in the locker room: Turner "denied knowing what the term 'Judas' meant in the context of the Dolphins offensive line. In fact, he denied ever hearing the term 'Judas' or 'Judas fine' used in the offensive line room. He also denied lecturing players on its meaning." (*Id.*)

In stating its conclusions based on these facts, the Report does "not credit Turner's denials." (*Id.* at 38.) But the Report does not conclude that Turner "established" a "Judas

Code."  It simply notes that:

> The evidence shows that Turner was aware of the "Judas" concept and that he had
> discussed its meaning with the linemen, explaining how Judas had betrayed Jesus
> Christ and defining Judas as a "snitch."

(*Id.* at 38.)  Turner no longer denies that he was aware of the "Judas" concept and that he used

the term "Judas" with players.  Indeed, he admits that, like his false statements about the blow-up

doll incident, his statements to defendants about the Judas Code were falsehoods and that he used

the Judas concept extensively in his "coaching career."  (Compl. ¶ 96; Ex. A at 20.)

   *Second*, Turner mischaracterizes the Report by alleging that defendants "falsely stated

that this fictional 'code' prevented Martin from reporting the 'abuse' to which he was allegedly

subjected by his teammates."  (*Id.* ¶ 92.)  The Report does not contain that statement.  Instead, it

concludes that fear of being labeled a "snitch" or "Judas" "played a role" in Martin's conduct

(*see* Report at 38) — a conclusion the Complaint does not allege to be false.

   **The Alleged "Insulting Comments" Statement.**  The Report found that "Incognito,

Jerry and Pouncey repeatedly and persistently made graphic, sexually explicit comments about

Martin's sister, a medical student whom they had never met."  (*Id.* at 9.)  Incognito and Jerry

admitted making these comments (*id.* at 76), and another player told defendants that "Incognito

and others routinely mocked Martin's sister and described the taunting as 'an everyday constant

thing'" (*id.* at 72–73).  "The evidence shows that crude and vulgar comments about Martin's

sister became a running 'joke' among the Dolphins offensive linemen that never completely

died."  (*Id.* at 73.)  Martin reported that he heard the insults about his sister throughout the

Dolphins training facility.  (*Id.*)  Several witnesses told defendants that Turner witnessed these

insults.  "Martin claimed that both of his offensive line coaches, Turner and Mosley, overheard

some of the raunchy comments about his sister, in the offensive line room or on the practice

field."  (*Id.* at 44.)  Incognito did not dispute Martin's assertions that Turner and Mosley heard

such comments.  (*Id.*)  "According to both Martin and Incognito, Turner neither joined nor criticized the harsh language."  (*Id.*)

In addition to reporting accurately the statements of Martin, Incognito and Mosley, the Report reported accurately what Turner told defendants.  "Turner denied witnessing or overhearing any inappropriate treatment of Martin by his teammates."  "Based on the entire record," the Report was careful *not* to make any findings about the extent of Turner's awareness of this conduct, expressing the opinions of the investigators that:

> Coaches Turner and Mosley were certainly aware of some of the insulting comments directed to Martin by Incognito, Jerry and Pouncey, although we cannot determine the full extent of that awareness and whether they had any appreciation of how hurtful this language was to Martin.  It is undisputed that these coaches never sought to stop the behavior.

(*Id.* at 45; *see also id.* at 73–74.)

The Complaint alleges that defendants "falsely accused Turner of hearing or learning about 'insulting comments' directed toward Martin yet failed to take action to stop it [*sic*]." (Compl. ¶ 102.)  But Turner does not dispute that the Report accurately describes what defendants were told by the first-hand witnesses.  Nor does he dispute that their testimony fully supports defendants' conclusion that Turner was aware of some of the insulting comments and took no action to stop them.

Indeed, Turner's own Response to the Wells Report[4] appears to admit that the Report's conclusion is true.  Turner's Response says that, "[a]s the Wells Report *correctly recognized,* Coach Turner was not present for 'the *bulk of the insulting comments*' described in the Report." (Ex. A at 14 (emphasis added).)  In other words, Turner *was* present for *some* of these insulting comments, just as the Report truthfully concluded.

---

[4]    Turner's Response is referenced in the Complaint at ¶ 24 n. 3 and attached here as Exhibit A.

**The Alleged "Text Messages" Statement.**  The Report recounts that shortly after Martin left the Dolphins, "Turner began sending him text messages urging him to defend Incognito in a public statement."  (Report at 46.)  "Martin responded to one, but then stopped communicating with Turner, who continued to pressure him to 'DO THE RIGHT THING' for several days afterward."  (*Id.*)  The full text of the messages is repeated verbatim in the Report.  (*See id.* at 46–47.)  The Report notes that "[w]hen he sent these messages, Turner knew that Martin had left the team unexpectedly, had hospitalized himself in connection with a mental health condition and that Martin had previously struggled with serious psychological problems and had contemplated suicide."  (*Id.* at 47.)  The Report "accept[s] that Turner may have believed in good faith that Incognito was being unfairly attacked by the media," but, based on the disclosed facts, it opines that Turner "should have realized that it was inappropriate to send such text messages to an emotionally troubled player," and that "these text messages to Martin demonstrated poor judgment on Coach Turner's part."  (*Id.*)

Turner disagrees with this opinion, alleging that defendants "falsely accused Turner of poor judgment and lack of compassion for one of his players who was obviously troubled."  (Compl. ¶ 115.)  But he disputes none of the *facts* underlying that opinion.  Instead, he alleges that defendants ignored evidence of Martin's friendship with Incognito (*id.* ¶ 112), which is untrue (*see* Report at 2, 13, 18, 35–37, 88–93, 97–98, 118–20), and, in any event, not germane to the issue of Turner's judgment in pressuring an emotionally troubled player.

## ARGUMENT

Courts have long recognized that, to protect public debate and freedom of speech, defamation actions warrant special scrutiny at the motion to dismiss stage.  *See, e.g., Southard* v. *Forbes, Inc.*, 588 F.2d 140, 145 (5th Cir. 1979) (the "very pendency of a [defamation] lawsuit may exert [a] chilling effect" on speech); *Mar-Jac Poultry, Inc.* v. *Katz*, 773 F. Supp. 2d 103,

11

111 (D.D.C. 2011) (because of the "threat" to freedom of speech, "district courts should apply close judicial scrutiny and properly dispose of defamation cases . . . as soon as possible"); *Stewart* v. *Sun Sentinel Co.*, 695 So. 2d 360, 363 (Fla. 4th DCA 1997); *Karp* v. *Miami Herald Publ'g Co.*, 359 So. 2d 580, 581 (Fla. 3d DCA 1978).  As a result, courts perform a "prominent function" at the pleading stage by determining whether a challenged statement is actionable. *Smith* v. *Cuban Am. Nat'l Found.*, 731 So. 2d 702, 704 (Fla. 3d DCA 1999).  "Rule 12(b)(6) should play a particularly important role in testing the plausibility of a plaintiff's defamation claim."  *Biro* v. *Condé Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013).

Accordingly, the standards for testing the sufficiency of a complaint — that it must allege facts that "raise a right to relief above the speculative level," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007), and that "labels and conclusions or a formulaic recitation of the elements of the cause of action will not do," *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) — should be stringently applied here.  "Indeed, *Iqbal* has a 'particular value' in this context, as forcing defamation defendants to incur unnecessary costs can 'chill the exercise of constitutionally protected freedoms.'"  *Biro*, 963 F. Supp. 2d at 279.  "[I]n defamation cases, Rule 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive."  *Id.*

<u>**THE COMPLAINT FAILS TO STATE A CLAIM.**</u>

**A.**     **The Elements of a Defamation Claim**

To state a claim for defamation, plaintiff must plead facts sufficient to show that the challenged statements are:  (1) substantially false; (2) statements of fact (not opinion); (3) defamatory; (4) "of and concerning" plaintiff; and (5) made with the requisite degree of fault.

12

*See Don King Prods., Inc.* v. *Walt Disney Co.*, 40 So. 3d 40, 43 (Fla. 4th DCA 2010); *Mile Marker, Inc.* v. *Petersen Publ'g, L.L.C.*, 811 So. 2d 841, 845 (Fla. 4th DCA 2002).

**1.   A Statement Must Be Substantially False to Be Defamatory.**

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd* v. *Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983).  A plaintiff must show that "the publication is *substantially and materially false*, not just . . . technically false." *Smith*, 731 So. 2d at 707 (emphasis added).  The challenged statement does not have to be "perfectly accurate" so long as "the 'gist' or the 'sting' of the statement is true." *Id.*  "[Q]uibbles over . . . characterization" cannot render a statement substantially false. *Broughton* v. *Livingston Indep. Sch. Dist.*, No. 08 Civ. 175, 2010 WL 3056862, at *11 (E.D. Tex. July 29, 2010).  Thus, "[a] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Smith*, 731 So. 2d at 707.

**2.   Statements of Opinion Are Not Defamatory.**

Statements of opinion are not defamatory because they are "subjective by definition" and "not capable of being proved false." *Info. Sys. & Networks Corp.* v. *City of Atl.*, 281 F.3d 1220, 1228 (11th Cir. 2002).  Thus, "[a] statement of pure opinion does not give rise to a defamation action." *Evans* v. *Bayer*, 684 F. Supp. 2d 1365, 1374 (S.D. Fla. 2010); *see also Morse* v. *Ripken*, 707 So. 2d 921, 922 (Fla. 4th DCA 1998).  "'Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the [publication] or which are otherwise known or available to the reader or listener as a member of the public.'" *Fortson* v. *Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006) (quoting *From* v. *Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981)).  "The determination of whether a statement is fact or opinion is a question of law for the court." *Morse*, 707 So. 2d at 922.  In making that determination, "the court must construe the statement in its totality, examining not

merely a particular phrase or sentence, but all of the words used in the publication." *Keller* v.

*Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985).  Further, the court "must consider

the context in which the statement was published and accord weight to cautionary terms used by

the person publishing the statement." *Keller*, 778 F.2d at 717.  "[E]ven a provably false

statement is not actionable if 'it is plain that the speaker is expressing a subjective view, an

interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of

objectively verifiable facts.'" *Riley* v. *Harr*, 292 F.3d 282, 289 (1st Cir. 2002) (quoting *Gray*,

221 F.3d at 248). And where, as here, the circumstances surrounding the publication involve a

report that discloses the facts on which the investigators' findings are based, courts have held

that such findings are non-actionable expressions of opinion.  *See, e.g., Spelson* v. *CBS, Inc.*, 581

F. Supp. 1195, 1203 (N.D. Ill. 1984).

### 3.   Statements That Do Not Subject Plaintiff to Hatred, Distrust, Ridicule or Contempt Are Not Defamatory.

To be defamatory, a statement (even if false) must "charge a person with an infamous

crime or tend to subject one to hatred, distrust, ridicule, contempt or disgrace or tend to injure

one in one's business or profession." *Seropian* v. *Forman*, 652 So. 2d 490, 495 (Fla. 4th DCA

1995).  This determination is "made by the court in the first instance." *Silvester* v. *Am. Broad.*

*Cos.*, 650 F. Supp. 766, 770 (S.D. Fla. 1986).  "Where the court finds that a communication

could not possibly have a defamatory or harmful effect, the court is justified in . . . dismissing the

complaint for failure to state a cause of action." *Byrd*, 433 So. 2d at 595.

### 4.   Statements Not "Of and Concerning" Plaintiff Are Not Defamatory.

The statements about which a plaintiff complains must be "of and concerning" him. *N.Y.*

*Times* v. *Sullivan Co.*, 376 U.S. 254, 288 (1964).  Thus, a plaintiff must "advance[] colorable

claims of having been identified and described by defamatory comment." *Geisler* v. *Petrocelli*,

616 F.2d 636, 640 (2d Cir. 1980).  "The 'of and concerning' requirement stands as a significant

limitation on the universe of those who may seek a legal remedy for communications they think

to be false and defamatory and to have injured them."  *Kirch* v. *Liberty Media Corp.*, 449 F.3d

388, 399–400 (2d Cir. 2006).

     **5.   Statements Made without the Requisite Degree of Fault Are Not Actionable.**

     Finally, a defamation plaintiff must allege facts sufficient to show that defendants acted

with the requisite fault.  The degree of fault depends on whether plaintiff is a public figure, in

which case facts establishing actual malice must be pled, or a private figure, which requires

negligence.  *See, e.g., Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 345, 352 (1974); *Rasmussen* v.

*Collier Cnty. Publ'g Co.*, 946 So. 2d 567, 570 (Fla. 2d DCA 2006).

**B.     The Complaint Does Not State a Claim for Defamation.**

     The alleged defamatory statements — some of which do not even appear in the Report —

fail to meet the above legal standards.  The Complaint therefore fails to state a claim and should

be dismissed.

     **<u>The Alleged Blow-Up Doll Statements.</u>**  Turner claims defendants falsely stated that he

"participated in . . . taunting" Player A for his supposed homosexuality by giving him a male,

instead of a female, blow-up doll.  (Compl. ¶ 83.)  This is non-actionable opinion, based on facts

Turner does not challenge.  The Complaint does not plead a single fact calling into question the

statements in the Report that defendants were told by Incognito and others that Player A was

persistently subjected to gay slurs and similar taunting.  And Turner now admits that he did in

fact give Player A a male blow-up doll, while giving the other players female dolls.

     The text and context of the Report make clear that defendants are stating an opinion on

this issue.  In addition to the Report's repeated use of "cautionary terms" alerting readers that its

findings are "opinions," *Keller*, 778 F.2d at 717, the very same paragraph of the Report including

the challenged finding takes care to recite all the evidence on which defendants relied, making clear that the finding is a conclusion based on defendants' weighing of the evidence, including the judgment that defendants "do not *believe* that Turner forgot this incident, which many others recalled" (Report at 20 (emphasis added)). And the subject of the statement — a judgment that Turner's purpose and motivation for giving the male blow-up doll to Player A amounted to participation in taunting him for his supposed homosexuality — is quintessential opinion because it is "subjective by definition" and "not capable of being proved false." *Info. Sys. & Networks Corp.*, 281 F.3d at 1228.[5]

Turner's allegation that Player A was not offended by Turner's vulgar gesture is irrelevant to the Report's conclusions about Turner's participation in the taunting. Defendants were justified in concluding that Turner's "gift" to Player A constituted participation in the taunting *regardless* of Player A's reaction — just as it is inappropriate to use racial or ethnic slurs, even if the intended victim claims not to be offended. Moreover, because Turner chose his "gift" *before* he could have known Player A's reaction, that subsequent reaction has no bearing on defendants' opinion that Turner's decision to give Player A a male blow-up doll constituted participation in the taunting.

Turner also claims defendants should have reported that Player A was not offended by Turner's conduct (Compl. ¶ 86), and incorrectly alleges that the Report stated that Player A was "offended" by Turner's gesture. (*See supra* at 7–8.) This is apparently a reference to the

___

[5] *See also Underwager* v. *Channel 9 Australia*, 69 F.3d 361, 367 (9th Cir. 1995) (statements about plaintiff's "motivations and personality" are opinions because they "are not provable as true or false because their content does not rest on 'a core of objective evidence'"); *Woods* v. *Evansville Press Co.*, 791 F.2d 480, 487 (7th Cir. 1986) (defendant's "comment as to the plaintiff's motivation for airing religious programming is best characterized as a statement of opinion and not a statement of fact"); *Murray* v. *HuffingtonPost.com, Inc.*, 21 F. Supp. 3d 879, 889 (S.D. Ohio 2014) ("speculative opinion statements as to [plaintiff's] unverifiable motivations [cannot be] construed as factual representations").

16

Report's statement, following a discussion of homophobic treatment of Player A by his teammates, that "[t]he evidence further shows that Player A regarded the persistent insults and mocking physical assaults as unwelcome." (Report at 21.)  This language refers to Player A's reaction to all the mistreatment he suffered, not specifically to the blow-up doll incident.  Turner does not allege that any of the facts on which the Report's conclusion is based were inaccurately reported.  Moreover, the statement in the Report is a statement "of and concerning" Player A, not Turner.  Turner can assert no "colorable claims of having been identified and described by" such a statement.  *Geisler*, 616 F.2d at 640.

**The Alleged "Judas" Statements.**  Turner alleges that defendants "falsely accused Turner of establishing a 'Judas Code' by which an offensive lineman could be fined for criticizing a fellow offensive lineman." (Compl. ¶ 91.)  He claims that "Turner had no role in the creation or implementation of the offensive line's self-imposed fine system." (*Id.*)  But the alleged defamatory statement does not appear in the Report, and the actual statements on which Turner relies are true and not defamatory.

As discussed *supra* at 8–9, the Report does *not* say that Turner established, created or implemented a "Judas Code" system.  Rather, it simply concludes that he was "aware of the 'Judas' concept" and had "discussed its meaning with the lineman, explaining how Judas had betrayed Jesus Christ and defining Judas as a 'snitch.'" (Report at 38.)  These conclusions are substantiated by the statements of several witnesses, and the Complaint alleges no facts suggesting that these statements were not truthfully reported.  Indeed, Turner himself now admits the statements are true, quibbling only that he has his own unique and implausible meaning for "Judas." (*See* Compl. ¶ 97.)  And that quibble is of no significance, because the Court may take judicial notice that "Judas" denotes "betrayal" — exactly what a snitch does — as a matter of

17

common English usage. *See, e.g., Porto* v. *Guirgis*, 659 F. Supp. 2d 597, 602 (S.D.N.Y. 2009) ("The biblical story of the betrayal of Jesus Christ by Judas Iscariot is well known."); *Ollman* v. *Novak*, 750 F.2d 970, 979 (D.C. Cir. 1984) (analyzing "common usage or meaning of the specific language of the challenged statement itself" in defamation case).

Moreover, the statements that actually appear in the Report are not defamatory as a matter of law, as Turner pleads no facts suggesting that use of the term "Judas" to mean "snitch" would subject him to "hatred, distrust, ridicule, contempt or disgrace" or injure him in his profession. *See Seropian,* 652 So. 2d at 495. Use of the name Judas to refer to "snitches" is a common colloquialism, not an infamous crime. *See id.* Nor can it be defamatory to state that an NFL coach was "aware" of a player-imposed fine system or discussed such a system with his players, since such fine systems are common in the NFL and operate with League permission.

Turner also alleges that defendants "falsely stated that this fictional 'code' *prevented* Martin from reporting the 'abuse' to which he was allegedly subjected by his teammates." (Compl. ¶ 92 (emphasis added).) But this alleged statement does not appear in the Report. It states only the conclusion—based on Martin's own statements—that the fear of being labeled a "snitch" or a "Judas" "played a role" in Martin's decision. The Complaint does not — and cannot — dispute that is what Martin told the investigators. And the fact that the investigators credited Martin's statements on that point is an expression of opinion, based on defendants' appraisal of statements made to them by Martin himself. As the Report notes, defendants "accept[ed]" Martin's "belie[f]" that "going to his coaches or other authority figures" meant risking "ostracism or even retaliation from his fellow linemen." (Report at 38.) Finally, the challenged statement, which concerns Martin's motivations for his actions, is not a statement "of and concerning" Turner and is not defamatory in any event, so it is not actionable. *See N.Y.*

18

*Times*, 376 U.S. at 288.

**The Alleged "Insulting Comments" Statement.**  Turner alleges that the Report "falsely accused Turner of hearing or learning about 'insulting comments' directed toward Martin yet failed [*sic*] to take action to stop it."  (Compl. ¶ 102.)  The challenged statement is both true and a non-actionable opinion.  As noted *supra* at 10, the Report reported the statements of several witnesses that vulgar comments directed to Martin were made "repeatedly and persistently" throughout the Dolphins facility.  Turner does not challenge this finding, and he *admits* that the statement in the Report — that Turner was "certainly aware of some of the insulting comments directed to Martin" — is true.  (*See supra* at 10–11.)  This is fatal to Turner's claim.  *See, e.g.*, *Hongjin Su* v. *Wu*, No. 11 Civ. 37, 2011 WL 1396994, at *6 (M.D. Fla. Apr. 13, 2011) ("To state a claim for defamation, a plaintiff must allege facts showing . . . falsity."); *Stearns Bank, N.A.* v. *Shiraz Invs., LLC*, No. 12 Civ. 313, 2012 WL 3133679, at *1, *2–3 (M.D. Fla. July 31, 2012) (dismissing claim because it "fail[ed] to allege facts showing a false statement").

In addition, the challenged statement is, at most, an expression of defendants' opinion, based on fully disclosed information received from Martin that Incognito did not dispute.  (*See supra* at 10.)  The nature of this statement as an expression of opinion is underscored in the Report by its disclosure of Turner's denial that he witnessed or overheard "inappropriate treatment" of Martin by his teammates, as well as by the accompanying statement that defendants were unable to determine the full extent of Turner's awareness of the insulting comments and whether he appreciated how hurtful the language was to Martin.  (*Id.* at 44-45.)

**The Alleged "Text Messages" Statement.**  The Complaint claims that defendants "made false accusations against Turner" by accusing him of "demonstrat[ing] poor judgment" in sending certain text messages to Martin shortly after he left the Dolphins.  (Compl. ¶¶ 108-09.)

19

Once again, Turner does not dispute the facts stated in the Report but simply disagrees with the investigators' opinions about those facts.  The Report sets out verbatim a series of text messages in which Turner repeatedly presses Martin to make a statement to "take the heat off" Incognito and "the locker room" — including, presumably, Turner himself — at a time when Turner admittedly knew that Martin had left the team unexpectedly and had hospitalized himself in connection with a mental health condition, after struggling with serious psychological problems and contemplating suicide.  (*See supra* at 11–12.)  Although Martin stopped responding after the first text message, Turner challenged him again and again, demanding: "I know you are a man of character.  Where is it?" and "You are a grown man.  Do the right thing."

Based on these undisputed text messages, the Report merely expressed the investigators' opinion that Turner's texts exhibited poor judgment:  "[A]ccept[ing] that Turner may have believed in good faith that Incognito was being unfairly attacked by the media," the Report opined that Turner "should have realized that it was inappropriate to send such text messages to an emotionally troubled player."  (Report at 47.)  Such a statement about a subjective matter is a textbook example of non-actionable opinion, as has been recognized in case after case.[6]  In addition, defendants' opinion that Turner "demonstrated poor judgment" in this particular instance is not defamatory.  Particularly because defendants accepted that Turner believed in "good faith" that Incognito was being unfairly treated by the media, the opinion that Turner demonstrated poor judgment in this one instance does not rise to the level of subjecting him to "hatred, distrust, ridicule, contempt or disgrace."  *Am. Airlines, Inc.* v. *Geddes*, 960 So. 2d 830,

---

[6]   *See, e.g., Harder* v. *Sunrise Senior Living, Inc.*, No. 2:09-CV-11094, 2009 WL 5171843, at *5 (E.D. Mich. Dec. 22, 2009) ("[T]he statement that someone displayed 'poor judgment' is necessarily subjective.  Whether someone displays good judgment or poor judgment is not susceptible to being provable as false and therefore cannot form the basis for a defamation action."); *Colantonio* v. *Mercy Med. Ctr.*, 901 N.Y.S.2d 370, 373-74 (App. Div. 2d Dep't

833 (Fla. 3d DCA 2007).

**C.      The Complaint Fails to Allege that Defendants Acted with the Requisite Fault.**

The Complaint also should be dismissed because Turner does not — and cannot — plead

facts showing that defendants acted with the requisite degree of fault.  Turner is a public figure,

who must — but does not and cannot — meet the "daunting" standard of actual malice.

*Klayman* v. *City Pages*, No. 13 Civ. 143, 2015 WL 1546173, at *13 (M.D. Fla. Apr. 3, 2015).

Indeed, even under the negligence standard applicable in claims by private persons, Turner has

not stated a claim.

**1.   Turner Is a Public Figure.**

Whether Turner is a public figure "is a question of law to be determined by the court."

*Mile Marker*, 811 So. 2d at 845.  "Sometimes position alone can make one a public figure."

*Barry* v. *Time, Inc.*, 584 F. Supp. 1110, 1118 (N.D. Cal. 1984).  "The position itself may be so

prominent that any occupant unavoidably enters the limelight and thus becomes generally known

in the community — a general public figure."  *Id.*  "Similarly, the responsibilities of a position

may include decision making that affects significantly one or more public controversies, in

which the occupant becomes a limited public figure for those controversies."  *Id.*  Such a person

"'invites attention and comment' by his decision to accept a position which, by its very nature,

puts the holder of that position in the center of a public controversy."  *Id.*

Turner's position as the offensive line coach for the Miami Dolphins, a team whose every

move is followed by numerous journalists and commentators and a huge public audience, is

alone sufficient to make him, at the very least, a limited purpose public figure.  Accordingly, a

long line of cases, beginning with *Curtis Publ'g Co.* v. *Butts*, 388 U.S. 130 (1967), have found

---

2010) (statements that plaintiff "had poor judgment," was "inappropriate," and created an
"uncomfortable environment," are non-actionable expressions of opinion).

professional and collegiate coaches and athletes to be public figures.  *See, e.g., Butts*, 388 U.S. at

154–55 (college football coach and athletic director); *Brewer* v. *Memphis Publ'g Co.*, 626 F.2d

1238, 1254–55 (5th Cir. 1980) (former college and professional football and NFL player); *Time,*

*Inc.* v. *Johnston*, 448 F.2d 378, 380 (4th Cir. 1971) (former professional basketball player and

current college assistant coach); *Vandenburg* v. *Newsweek, Inc.*, 441 F.2d 378, 379 (5th Cir.

1971) (college track coach); *Cepeda* v. *Cowles Magazines & Broad., Inc.*, 392 F.2d 417, 419

(9th Cir. 1968) (professional basketball player); *Briggs* v. *Univ. of Detroit-Mercy*, No. 13 Civ.

12583, 2014 WL 1818000, at *4 (E.D. Mich. May 7, 2014) (college basketball player and

coach); *Barry*, 584 F. Supp. at 1118 (college basketball coach); *Chuy* v. *Phila. Eagles Football*

*Club*, 431 F. Supp. 254, 267 (E.D. Pa. 1977) (former professional football player), *aff'd*, 595

F.2d 1265, 1280 (3d Cir. 1979).  Indeed, several courts have concluded that "sports figures are

generally considered public figures because of their position as athletes *or coaches*."  *Marcone* v.

*Penthouse Int'l Magazine For Men*, 754 F.2d 1072, 1083 (3d Cir. 1985) (emphasis added); *see*

*also Briggs*, 2014 WL 1818000, at 3 (same) (quoting *Falls* v. *Sporting News Pub. Co.*, 714 F.

Supp. 843, 846-47 (E.D. Mich. 1989)).  "[A] common thread in these cases is that one's

voluntary decision to pursue a career in sports, whether as an athlete *or a coach*, 'invites

attention and comment' regarding his job performance and thus constitutes an assumption of the

risk of negative publicity."  *Barry*, 584 F. Supp. at 1119 (emphasis added).

     Beyond his acceptance of a position that renders him a public figure under this case law,

Turner has repeatedly made comments and provided interviews to national and local media and

has repeatedly been praised and criticized by commentators and others regarding the team's

performance and prospects and his coaching practices and philosophy.  (*See supra* at 2–3.)

These activities weigh heavily in support of public figure status.  *See, e.g., Silvester*, 839 F.2d

1491, 1494–97 (11th Cir. 1988); *Mile Marker*, 811 So. 2d at 846; *Friedgood* v. *Peters Publ'g Co.*, 521 So. 2d 236, 240, 241 (Fla. 4th DCA 1988).

   Turner's prominent role in the 2012 HBO series *Hard Knocks* is compelling evidence of public figure status. Turner was viewed as a "star" of the series, and numerous media outlets remarked on his coaching style and the role he played on the show. (*See supra* at 3-4.) The show spotlighted Turner's relationship with Dolphins players — including Martin, Incognito and Pouncey, the same players who are at the center of the Report — and Turner played to his audience, showing off his hard-nosed coaching style. HBO's decision to broadcast the show and to focus attention on Turner is powerful evidence of the public interest in the way that professional football coaches like Turner do their jobs. Moreover, as a successful football player and coach, Turner continues to enjoy access to the channels of mass communication to tell his side of story — access of which he and his representatives have taken full advantage. We submit with this memorandum a sample of press reports in which Turner was interviewed or quoted about football-related matters. (*See* Exs. E–G.) Indeed, after the Report was issued, Turner issued his own 24-page "Response to the Wells Report." (Ex. A.) And he participated in interviews on high-profile sports radio shows. (*See* Exs. M–N.)

   The fact that Turner has greater media access than a private person is an important hallmark of public figure status. "[P]ublic figures usually enjoy greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements [than] private individuals enjoy." *Gertz*, 418 U.S. at 344; *see also Mile Marker*, 811 So. 2d at 846 (finding plaintiff "enjoyed greater media access, consistent with public figure status"); *Friedgood*, 521 So. 2d at 240, 241 (plaintiff "had ample 'access to channels of effective

communication and hence . . . a . . . realistic opportunity to counteract false statements'") (quoting *Street* v. *Nat'l Broad. Co.*, 645 F.2d 1227, 1234 (6th Cir. 1981)) (alteration in original).

Even prior to the release of the Report, Turner "voluntarily inject[ed]" himself, or was "drawn" involuntarily, into the highly public controversy over Martin's departure from the team. *Gertz*, 418 U.S. at 351. For example, in a November 17, 2013 article (nearly three months *before* the Report was published), ESPN.com reported that "[s]ources inside and outside of the Dolphins' organization said Turner, who has a military background, would 'insult, bully and pile it on' Martin, who left the team last week." (Ex. O; *see also* Ex. P (reporting that Turner "was overheard last week speaking of how 'overblown' the Martin-NFL investigation story is even after team owner Stephen Ross said the story was 'appalling' to him.")

Thereafter, certain Dolphins players, as well as head coach Joe Philbin, made public statements defending Turner. (Exs. Q–R.) As offensive lineman Bryant McKinnie publicly stated during that period (again, months before the Report was published), a "lot of pressure is on [Turner] through this situation." (Ex. R.)

### 2. The Complaint Fails to Plead Facts Sufficient to Establish Actual Malice.

To satisfy the "daunting" actual malice standard, *Klayman*, 2015 WL 1546173, at \*13, Turner must "demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp.* v. *Consumers Union*, 466 U.S. 485, 511 n.30 (1984); *see also Mile Marker*, 811 So. 2d at 845.

Pleading facts showing that defendants were mistaken or ignorant, reached questionable conclusions, conducted an inadequate investigation or were biased is plainly insufficient — a plaintiff must plead facts showing that the defendants *actually believed* at the time that their statements were false, or recklessly shut their eyes to clear evidence of falsity. *See, e.g., Melville*

24

v. *Town of Adams*, 9 F. Supp. 3d 77, 111 (D. Mass. 2014) (pleading that defendant "mistakenly believed" witness' testimony insufficient to withstand motion to dismiss); *Ello* v. *Singh*, 531 F. Supp. 2d 552, 577 (S.D.N.Y. 2007) ("it is well settled that a defendant's failure to investigate before making defamatory statements does not support a finding of actual malice").

Moreover, "given the difficulty of proving actual malice, . . . as well as the fact that actual malice must be proven by clear and convincing evidence . . . it stands to reason that Rule 12(b)(6) should play a particularly important role in testing the plausibility of a plaintiff's defamation claim." *Biro*, 963 F. Supp. 2d at 279; *see also id.* at 278 ("Not only is '[p]roving actual malice [ ] a heavy burden,' but, in the era of *Iqbal* and *Twombly*, pleading actual malice is a more onerous task as well.").

Turner makes no attempt to plead specific facts from which an inference of actual malice can be drawn. Instead, for each of the challenged statements, the Complaint relies on nothing more than the formulaic allegation that "[d]efendants acted with actual malice because they knew, or were reckless in not knowing, that their statements about Turner in the Wells Report were false and misleading," and that "[d]efendants were aware of relevant facts, or knowingly and recklessly ignored relevant facts, or deliberately avoided learning of those facts, in order to satisfy their agenda as dictated by the NFL." (*See, e.g.,* Compl. ¶ 134.)

Courts have routinely rejected such efforts to evade the actual malice pleading requirements. "Bald allegations that [defendants] acted with malice — unadulterated by any factual support whatsoever — do not" meet the pleading standard. *Orenstein* v. *Figel*, 677 F. Supp. 2d 706, 711 (S.D.N.Y. 2009). Indeed, "[t]his kind of conclusory allegation — a mere recitation of the legal standard — is precisely the sort of allegation[] that *Twombly* and *Iqbal* rejected." *Mayfield* v. *NASCAR, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012). Thus, "[t]o begin, the

25

court must strip away and discard the complaint's conclusory legal allegations [of actual malice]."  *Shay* v. *Walters*, 702 F.3d 76, 82–83 (1st Cir. 2012).

Nor can Turner plead malice by his unsupported suggestion that defendants were somehow biased in deciding what information to include in the Report, or which testimony to credit.  (*See* Compl. ¶¶ 3–6, 34–35.)  As a matter of law, bias does not establish actual malice.  *See, e.g., Silvester*, 650 F. Supp. at 779 ("bias, 'in the sense of a determined effort to conform a previously formed suspicion,' does not establish malice") (quoting *Westmoreland* v. *CBS Inc.*, 596 F. Supp. 1170, 1174 (S.D.N.Y. 1984)); *Biro*, 963 F. Supp. 2d at 285 ("The fact that [a publication] is one sided or fails to include as many positive features about [plaintiff] as negative ones has no tendency to prove that the publisher believed it to be false.") (internal quotations omitted); *id.* at 288 n.23 (allegation that defamation defendant acted with "confirmation bias" is "conclusory and, by itself, fails to support a plausible inference of actual malice").  In any event, other than empty rhetoric, the Complaint alleges nothing to show that defendants harbored any bias against Turner.  And any allegation of bias is implausible given the efforts made in the Report to include Turner's statements and views and defendants' decision to "commend" him in his efforts to help Martin and to note that both Martin and Incognito viewed Turner as a good coach.  (*See, e.g.,* Report at 115.)  Far from suggesting bias or malice, the Report reflects utmost fairness towards Turner.

Moreover, the extensive interviews and investigations reflected in the Report weigh heavily against a finding of actual malice.  *See Vilma* v. *Goodell*, 917 F. Supp. 2d 591, 596 (E. D. La. 2013); *Parisi* v. *Sinclair*, 845 F. Supp. 2d 215, 219 (D.D.C. 2012).  Indeed, a finding of actual malice is particularly unwarranted where — as here — defendants extensively interviewed Turner and included his responses and denials throughout the Report.  *See Biro*, 963 F. Supp. 2d

at 288; *Parisi*, 845 F. Supp. 2d at 218–19.[7]

Against this background, stripping away the "conclusory legal allegations," there is nothing in the Complaint that supports a finding of fault as to any of the statements at issue:

*First,* regarding the blow-up doll gift, Turner alleges that defendants knew or were "reckless" in not knowing that Turner intended the gift "as a joke" (Compl. ¶ 85), that Player A viewed it as a joke (*id.* ¶ 86), and that "[e]ssentially everyone present echoed" Player A's alleged view (*id.* ¶ 87).  But Turner identifies no facts that were not accurately reported on the subject of the blow up doll and no witnesses who should have been interviewed but were not.  The only "fact" that was not reported was Turner's own view that his actions were meant as a joke and had nothing to do with Player A supposedly being gay — a view that Turner affirmatively refused to disclose to the investigators when he was interviewed.  Moreover, Turner concedes that *not* everyone viewed his gift of the male blow-up doll as the "inoffensive joke" he now claims it was (Compl. ¶ 87), and he does not challenge the statement in the Report that "Martin [in particular] was offended that Turner had endorsed the humiliating treatment of Player A by participating in it" (Report at 20).  These undisputed facts are more than sufficient to establish that the challenged statement — that Turner "participated in the taunting" of Player 1 by giving him a male blow-up doll — was not made with actual malice.  *See, e.g., Bose Corp.*, 466 U.S. at 512–13 (failure to plead actual malice where defendants' "adoption of the language chosen was 'one

---

[7] Turner also cannot establish actual malice, as he purports to do, by alleging that defendants failed to conduct further investigations to Turner's liking, unless the disputed statement was patently unbelievable on its face, something that Turner does not (and cannot) allege as to any of the statements at issue.  *See, e.g., Harte-Hanks Comm'ns, Inc.* v. *Connaughton*, 491 U.S. 657, 688 (1989) ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard."); *Casano* v. *WDSU-TV Inc.*, 464 F.2d 3, 5 (5th Cir. 1972) ("'investigatory failure' [is] not tantamount to malice") (quoting *Butts*, 388 U.S. at 130); *Gertz*, 418 U.S. at 331 ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth").

27

of a number of possible rational interpretations' of an event 'that bristled with ambiguities'")
(quoting *Pape*, 401 U.S. at 289–90).

*Second*, Turner alleges that "Defendants had a duty to investigate and discover the true
facts regarding Turner's occasional use of the term 'Judas,' namely, that it had nothing to do
with 'snitching' or reporting misconduct to coaches." (Compl. ¶ 97.) But Turner fails to allege a
single fact plausibly suggesting that defendants actually knew that any of their statements
concerning the "Judas" concept were false, or subjectively had serious doubts as to the truth of
those statements. Although Turner now quibbles that he did not use the term "Judas" with his
players to mean "snitch," as stated in the Report, but used it only to describe "situations in which
one of his players transferred responsibility for an on-field error to another," he cannot possibly
establish actual malice on that basis, because he does not allege any way in which defendants
could have learned of his alleged interpretation prior to issuing the Report. As for Turner's
claim based on an alleged statement that the "Judas Code" "prevented Martin from reporting the
'abuse' to which he was allegedly subjected by his teammates," Turner identifies no facts and no
potential source of any information that would suggest there was anything false about the
statement that actually appeared in the Report: that "[w]e accept that the fear of being labeled a
'snitch' or a 'Judas' *played a role* in Martin's decision not to report abuse by his teammates."

*Third*, Turner alleges that the statement in the Report that he knew of insulting comments
about Martin's sister and failed to take action "is contradicted by evidence Defendants knew
about and intentionally chose to ignore, or were reckless in not knowing." (Compl. ¶ 103.) The
only such evidence identified, however, consists of alleged statements by former and current
Dolphins players and coaches that "the Dolphins' locker room was the 'exact same' as all the
other locker rooms in which [certain unidentified former and current Dolphins players and

28

coaches] had been." (Compl. ¶¶ 105–06.) But Turner does not explain how any such evidence could have led defendants to believe that he was *not* aware of any of the insults about Martin's sister; the truth of these statements depends only on specific events in the Dolphins locker room, not on how those activities may compare with the conduct in other locker rooms.

*Fourth,* the Complaint alleges, with respect to the statement in the Report that Turner demonstrated "poor judgment," that "Turner knew — and Defendants purposefully ignored — that Martin and Incognito were close friends, and Turner believed that Martin did in fact want to put out a statement defending his friend and respected member of the Team but, as Turner correctly concluded and Defendants ignored, a third-party was advising — or directing — Martin not to set the record straight about Incognito." (Compl. ¶ 112.) Turner further alleges that "Defendants ignored this important factual context when concluding that Turner was insensitive and uncaring about Martin's well being." (*Id.* ¶ 113.) But those matters are fully disclosed in the Report, and the Complaint pleads no basis on which to conclude that they should have led defendants to reconsider their opinion that he "demonstrated poor judgment" in sending his text messages to Martin when he knew Martin was being treated for psychological problems and had twice attempted suicide.

### 3.  Turner Fails to Allege That Defendants Acted Negligently.

The Complaint also should be dismissed because it fails to allege that defendants acted negligently. *See Shay*, 702 F.3d at 82-83 ("In determining whether allegations [of negligence] cross the plausibility threshold, an inquiring court need not give weight to bare conclusions, unembellished by pertinent facts.") The Report is the product of a thorough investigation over a period of more than three months, including interviews of more than 100 people. Defendants interviewed Turner on two occasions, and specifically included in the Report his views on the issues relevant to the investigation. Against these undisputed facts, Turner does not allege any

29

specific facts demonstrating that defendants failed to use ordinary care to determine the truth or falsity of the statements at issue.  For this additional reason, Turner's claims fail.  *See Hakky* v. *Wash. Post Co.*, 2010 WL 2573902, at *6 (M.D. Fla. June 24, 2010) (dismissing claim for failure to allege sufficient facts demonstrating negligence); *Shay*, 702 F.3d at 82 (same).

D.      **The Report Is Subject to a Qualified Privilege That Has Not Been Overcome.**

Finally, the Complaint should be dismissed because the Report is subject to a qualified privilege, which can be overcome only by allegations establishing express malice — *i.e.,* "ill will, hostility, evil intention to defame and injure." *Nodar* v. *Galbreath,* 462 So. 2d 803, 809–11 & n.8 (Fla. 1984).  As numerous courts have recognized, the qualified privilege recognized in *Nodar* extends to public dissemination of information concerning newsworthy events. *See, e.g.*, *Palmisano* v. *Allina Health Sys.*, 190 F.3d 881, 885 (8th Cir. 1999); *Richmond* v. *Southwire Co.,* 980 F.2d 518, 519 (8th Cir. 1992); *Straitwell* v. *Nat'l Steel Corp.*, 869 F.2d 248, 250–51 (4th Cir. 1989); *FloTech Inc.* v. *E.I. Du Pont de Nemours & Co.*, 814 F.2d 775, 778–79 (1st Cir. 1987); *Gallo* v. *Princeton Univ.*, 656 A.2d 1267, 1272–73 (N.J. App. Div. 1995); *Tamburo* v. *Dworkin*, 974 F. Supp. 2d 1199, 1214 (N.D. Ill. 2013); *Houston Oilers, Inc.* v. *Harris Cnty.*, 960 F. Supp. 1202, 1208 (S.D. Tex. 1997); *Olson* v. *3M Co.*, 188 Wis.2d 25, 45–46 (Wis. Ct. App. 1984). Here, the public interest in the subject of the Report is undeniable — it is affirmatively pled in the Complaint.  (*See* Compl. ¶¶ 1–5.)  And Turner cannot overcome the qualified privilege because he alleges no facts suggesting that any defendant was motivated by hostility or ill-will.

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiff's Complaint with prejudice.

Dated:    Miami, Florida
            October 28, 2015

                              Respectfully submitted,

                              **HOGAN LOVELLS US LLP**
                              600 Brickell Avenue
                              Suite 2700
                              Miami, Florida 33131
                              Telephone:     (305) 459-6500
                              Facsimile:     (305) 459-6550

                              By: <u>/s/ Marty Steinberg</u>
                                      Marty Steinberg, Esq.
                                      Fla. Bar No.: 187293
                                      <u>marty.steinberg@hoganlovells.com</u>
                                      Justin S. Brenner, Esq.
                                      Fla. Bar No. 94216
                                      <u>justin.brenner@hoganlovells.com</u>

                              **PAUL, WEISS, RIFKIND, WHARTON &**
                              **GARRISON LLP**
                              Lewis R. Clayton (*pro hac vice* pending)
                              Daniel J. Leffell (*pro hac vice* pending)
                              Darren W. Johnson (*pro hac vice* pending)
                              1285 Avenue of the Americas
                              New York, NY  10019-6064
                              Telephone: 212-373-3000
                              Fax: 212-757-3990
                              lclayton@paulweiss.com
                              dleffell@paulweiss.com
                              djohnson@paulweiss.com

                              *Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 28, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which caused the foregoing document to be served on all counsel of record.


By:<u>/s/  Marty Steinberg          </u>
     Marty Steinberg

32