# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 15-61855-CIV-GAYLES

**JAMES L. TURNER,**
                    **Plaintiff,**

            **v.**

**THEODORE V. WELLS, JR.; and**
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP,**
                    **Defendants.**

_____/

## ORDER

      This is an action claiming defamation. Following the widely publicized departure of former Miami Dolphins offensive lineman Jonathan Martin from the team in the middle of the 2013 football season, the National Football League commissioned Defendant Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") to conduct an investigation into allegations that Martin's departure came as a result of a campaign of bullying and harassment occasioned upon him by several of his teammates, namely, Richie Incognito, John Jerry, and Mike Pouncey. Subsequent to that investigation, Defendant Theodore V. Wells, Jr., an attorney and partner at Paul, Weiss and the lead investigator, authored (along with three other Paul, Weiss attorneys) the 144-page *Report to the National Football League Concerning Issues of Workplace Conduct at the Miami Dolphins* (the "Wells Report" or the "Report"), which detailed the investigation's findings and the conclusions drawn therefrom. Although the Wells Report centered on the bullying scandal and Martin's departure from the team, it also stated facts and drew several conclusions as to Martin's teammates and many other individuals, including then–offensive line head coach James L. Turner, Jr., the Plaintiff here. Turner alleges that the Report contains several false statements and accusations that

defamed him and resulted in the termination of his employment with the Dolphins.

Presently before the Court is the Defendants' Motion to Dismiss [ECF No. 25]. The Court has carefully considered the Complaint, the Wells Report, the briefs and arguments of counsel, and the applicable law. For the reasons that follow, the Court finds that none of the challenged statements contained in the Wells Report are actionable for defamation, and no omission or juxtaposition of any facts gives rise to a claim of defamation by implication. Consequently, the Defendants' motion shall be granted.

## I.     BACKGROUND

### A.     *Turner's Career*

According to the allegations in the Complaint, Turner attended Boston College, where he played as a fullback for the Boston College Eagles football team and served as team captain during the 1987 college football season. Compl. ¶ 18. Following his graduation from Boston College, Turner played semi-professional football for a brief time before turning his attention to coaching, beginning with a position as an offensive coach for his former high school team in Braintree, Massachusetts, and as offensive coordinator for an English semi-professional team. *Id.* ¶ 19. In 1990, Turner joined the United States Marine Corps and became a platoon commander and operations officer, serving for four years in the Middle Eastern, Asian, and European theaters. *Id.* ¶ 20. He was honorably discharged in 1994 and returned to coaching football. *Id.* ¶ 21. Between 1994 and 2011, Turner held various coaching positions at Northeastern University, Louisiana Tech University, Harvard University, Temple University, the University of Delaware, and Texas A&M University before being hired as the Dolphins' offensive line coach for the 2012 Season, where he remained until his termination in February 2014. *Id.* ¶ 21-22.

### B.     *Martin's Departure from the Dolphins and the Defendants' Investigation*

On October 30, 2013, the national sports media began reporting that Martin had "gone

AWOL" from the Dolphins after a cafeteria "prank" by his teammates. *Id.* ¶ 31. One commentator reported that the incident was the "final straw" for Martin and, as a result, Martin had checked himself into a treatment facility. *Id.* Over the following days, reports began to surface containing allegations that Martin had been a victim of locker room bullying and harassment by his Dolphins teammates. *Id.* ¶ 32. The story quickly gained national attention. *Id.*

On November 6, 2013, NFL Commissioner Roger Goodell announced that the NFL had retained Paul, Weiss to conduct "an independent investigation" led by Wells "into issues of work-place conduct at the Miami Dolphins" and to "prepare a Report for the commissioner," which would be made public. *Id.* ¶¶ 2, 33-34 (internal quotation marks omitted). During the course of the investigation, Wells and other Paul, Weiss partners, associates, and paralegals interviewed current and former Dolphins players, Dolphins coaching staff, and front office personnel; reviewed emails and text messages between Martin and his teammates and coaches; and interviewed Martin's parents, his agent, and his former teammates and coaches at Stanford University. *Id.* ¶ 36. Turner was interviewed twice during the investigation. The first interview was conducted in person in November 2013 between Wells, two other members of his team, Turner, and a member of the Dolphins' legal staff. *Id.* ¶ 39. The second interview was conducted via Skype the following month; Turner characterizes this interview as "more accusatory" than the first, with Wells's questioning taking on a "suggestive and aggressive tone," which caused Turner to feel "uncomfortable and defensive." *Id.* ¶ 43.

### C.   *The Wells Report*

On February 14, 2014, the Defendants publicly released the report of the investigation, *i.e.*, the Wells Report. *Id.* ¶ 45. Over the course of its 144 pages, the Wells Report found that several Dolphins players subjected Martin to "persistent harassment," making insulting and derogatory comments about Martin and his family, which "contributed to Martin's decision to leave the

team." *Id.* (quoting Compl. Ex. A ("Wells Report") at 4) (internal quotation marks omitted). It also found that Dolphins players and coaches created a culture that both encouraged this bullying and harassment and discouraged Martin from seeking help from coaches or management without being considered a "snitch" or a "traitor." *Id.* ¶ 49. Ultimately, it concluded that "the treatment of Martin and others in the Miami Dolphins organization at times was offensive and unacceptable in any environment, including the world professional football players inhabit." *Id.* ¶ 45. (quoting Wells Report at 5) (internal quotation marks omitted). Five days after the Wells Report was released, the Dolphins fired Turner. *Id.* ¶ 48.

Turner points to four passages pertaining to him within the Report that he alleges contain false and defamatory statements. He alleges that "the Defendants accused [him] of: [1] participating in the 'harassment' of a Dolphins player who teammates often joked was gay (though he was not); [2] establishing a so-called 'Judas Code' under which players were not supposed to 'snitch' on teammates or they could face a fine; [3] knowing about the bullying and harassment directed at Martin but failing to take any action to stop it; and [4] improperly pressuring Martin publicly to defend Incognito after Martin quit the team." *Id.* ¶ 47.

### 1.     The "Blow-Up Doll" Incident

The Report asserts that "Player 1" (anonymized in both the Report and the Complaint),[1] a Dolphins offensive lineman, was the subject of homophobic taunting. *Id.* ¶ 79. Among other things, it states that Incognito, Jerry, and Pouncey often called him homophobic slurs in a demeaning tone, and that Incognito accused him of performing oral sex on men and urinating while sitting down, as well as asking him, "[W]here's your boyfriend?" Wells Report at 19. Incognito acknowledged that Player 1 was not actually believed to be gay, but he was spoken to repeatedly and persistently in this manner—or, in Incognito's words, "every day from everybody, high frequency."

---

[1]    This individual is anonymized as "Player A" in the Report. Player A/Player 1 does not refer to Jonathan Martin.

*Id.* Incognito and other players also reported that Incognito, Jerry, and Pouncey "routinely touched [Player 1] . . . in a mockingly suggestive manner, including on his rear end, while . . . taunt[ing him] about his supposed homosexuality." *Id.*

The Report contends that Turner "was aware of the running 'joke' that Player [1] was gay, and on at least one occasion, he participated in the taunting." *Id.* at 20. Specifically, during the 2012 holiday season, Turner gave the offensive linemen stockings filled with gifts, including a CD of music and a copy of the book *Men Are from Mars, Women Are from Venus*. Compl. ¶ 80. Turner alleges that the purpose of the gifts was to encourage the players to work on their relationships with their significant others. *Id.* He also warned the players that if they did not learn to improve their relationships with people outside football, those relationships might not last. *Id.* To that end, he presented each player with a female "blow-up doll." *Id.* Each player, that is, except Player 1, to whom Turner gave a male blow-up doll. *Id.* ¶ 81. Martin told the Defendants he was surprised Turner made this gesture to Player 1, and he was offended that Turner "endorsed the humiliating treatment of Player 1 by participating in it." *Id.* (quoting Wells Report at 20).

According to the Report, "When interviewed, Turner was asked if he gave Player [1] a male blow-up doll. He replied, 'I can't remember.' We do not believe that Turner forgot this incident, which many others recalled." Wells Report at 20. According to Turner, the Defendants did not ask him about the incident during the first interview, but rather waited until the second, "purposely confrontational and accusatory" interview to ask. Compl. ¶ 89. When asked about the incident, Turner questioned its relevance to Martin's decision to leave the team and, in the face of the Defendants' aggressive tone, dismissed the doll question as irrelevant and accusatory. *Id.*

Turner alleges that the genesis of the "joke" of the male blow-up doll was that Player 1 did not have success dating women. *Id.* ¶ 85. "Thus, giving Player 1 the male doll was intended as a joke and was in the same spirit as the rest of the gift exchange" and "in no way expressed cruelty

or homophobia on Turner's part." *Id.* Turner states that the Defendants failed to include that Player 1 viewed the gift as a joke and did not view the prank as malicious "in any way." *Id.* ¶ 86 (internal quotation marks omitted). According to Turner, Player 1 himself believes that the Defendants portrayed the incident out of context, and Player 1 released a statement on national television to that effect. *Id.* Turner claims that "[i]n light of the nearly universal view that Turner's gift was an inoffensive joke enjoyed by those present, and particularly in light of the fact that Player 1 himself was not offended by the episode, an impartial analysis could only conclude that Turner did not behave inappropriately with respect to this incident." *Id.* ¶ 87.

### 2.       The Existence of a "Judas Code"

Turner next alleges that Defendants falsely accused him of "establishing a 'Judas Code' by which an offensive lineman could be fined and branded a 'Judas'—a reference to the Biblical Judas who betrayed Jesus Christ and meaning, in this context, a traitor or 'snitch'—for criticizing a fellow offensive lineman." *Id.* ¶ 91. He further alleges that the Defendants "falsely stated that this fictional 'code' prevented Martin from reporting the 'abuse' to which he was allegedly subjected by his teammates." *Id.* ¶ 92.

The Report states that Martin claimed that a general code against "snitching" exists in football and that he did his best to honor that rule. Wells Report at 37. It continues: "[t]he Dolphins offensive line enforced this general prohibition with their own peculiar rule—the so-called 'Judas' code, which was buttressed by the imposition of fines . . . ." *Id.* As an example of this rule in action, the Report provides that "if Coach Turner, while watching game film footage, criticized a lineman for missing an assignment, and that lineman pointed out that one of his teammates was actually at fault, that lineman might be labeled a 'Judas,' which could result in a fellow player imposing a fine." *Id.* at 37-38. The Defendants reported that multiple offensive lineman were familiar with the "Judas" concept and had told the Defendants that Turner had discussed the concept

with them. *Id.* at 38. The Report states that Turner denied hearing the term "Judas" or "Judas fine" in the offensive line locker room and denied lecturing the offensive linemen on the meaning of the term "Judas." *Id.* But the Report ultimately discredits Turner's denials and finds that "[t]he evidence shows that Turner was aware of the 'Judas' concept and . . . he had discussed its meaning with the linemen, explaining how Judas had betrayed Jesus Christ and defining Judas as a 'snitch.'" *Id.*

Regarding Martin, the Defendants reported that he believed that going to his coaches or other authority figures "meant risking ostracism or even retaliation from his fellow linemen." *Id.* On this issue, the Report concludes: "We accept that the fear of being labeled a 'snitch' or a 'Judas' played a role in Martin's decision not to report abuse from his teammates." *Id.* The Defendants also state that "the better course of action would have been for Martin to report the abuse," and that they "strongly believe[d]" that had Martin reported the harassment to a coach, front office executive, or his agent, the team could have addressed his issues before it was too late. *Id.*

In his Complaint, Turner alleges that he had no role in creating or implementing the offensive line's fine system. Compl. ¶ 92. He also alleges that the facts do not support the Defendants' conclusion that his occasional use of the term "Judas" "to describe situations in which one of his players transferred responsibility for an on-field error to another player impacted Martin's behavior." *Id.* ¶ 96. By ignoring the evidence when analyzing the "code" and by falsely connecting his "use of the term 'Judas' to Martin's failure to report issues he may have had with his teammates," Turner alleges that the Defendants "falsely accused [him] of playing a role in Martin's emotional struggles and decision to leave the Team." *Id.* ¶ 99.

### 3.      "Insulting Comments" Regarding Martin's Sister

Turner also alleges that the Defendants falsely accused him "of hearing or learning about

'insulting comments' directed toward Martin yet fail[ing] to take action to stop it." *Id.* ¶ 102. Specifically, the Report details how Incognito, Jerry, and Pouncey made several crude sexual remarks about Martin's sister both orally and via text message to Martin. *See* Wells Report at 9-11, 13, 15, 32-33, 44, 71-76. Martin told the Defendants that he was "particularly offended" by these comments, but his obvious discomfort only increased the frequency and intensity of the remarks. *Id.* at 10. The Report found, based on the evidence, that the vulgar comments about Martin's sister became a running joke among the offensive linemen, with Martin himself claiming that he heard taunts about his sister, often several times per day, from early in the 2012 season until he left the team in October 2013. *Id.* at 73. The Report reflects Martin's claim that he heard the insults about his sister "throughout the Dolphins training facility—in the locker room, on the practice field, in the showers, in the offensive line room (often before meetings got started), even sometimes in the cafeteria." *Id.*

Regarding Turner, the Report states: "[Martin] said that these comments at times were made in the presence of Coach Turner, who neither participated nor urged his teammates to stop." *Id.* at 74. The Report also states, "Martin claimed that both of his offensive line coaches, Turner and [Chris Mosley, the Dolphins former assistant offensive line coach], overheard some of the raunchy comments about his sister in the offensive line room or on the practice field. . . . According to both Martin and Incognito, Turner neither joined nor criticized the harsh language. Also, both Martin and Incognito said they thought Turner was a good coach." *Id.* at 44. The Report concludes: "[W]e find that Coaches Turner and Mosley were certainly aware of some of the insulting comments directed to Martin by Incognito, Jerry[,] and Pouncey, although we cannot determine the full extent of that awareness and whether they had any appreciation of how hurtful this language was to Martin. It is undisputed that these coaches never sought to stop the behavior." *Id.* at 45.

8

**4.      Text Messages between Turner and Martin**

Beginning on November 2, 2013, after Martin left the Dolphins, Turner and Martin en-

gaged in a text message discussion of the media's coverage of Martin's departure from the team:

**November 2, 2013**

TURNER:     Richie Incognito is getting hammered on national TV. This is not
right. You could put an end to all the rumors with a simple state-
ment. DO THE RIGHT THING. NOW.

MARTIN:     Coach. I want to put out a statement. Believe me I do. This thing
has become a huge story somehow. But I've been advised not to . . .
And I'm not supposed to text anyone either cuz last time I responded
to a teammate (Richie) I was intentionally manipulated and the
conversation was immediately forwarded to a Reporter.

TURNER:     He is protecting himself. He has been beat up for 4 days. Put an end
to this. You are a grown man. Do the right thing.

TURNER:     John I want the best for you want your health but make a statement
and take the heat off Richie and the locker room. This isn't right.

**November 3, 2013**

TURNER:     I know you are a man of character. Where is it?

**November 6, 2013**

TURNER:     It is never too late to do the right thing!

Compl. ¶ 108 (quoting Wells Report at 46-47). Upon review of this conversation, the Defendants

"accept[ed] that Turner may have believed in good faith that Incognito was being unfairly attacked

by the media, but he should have realized that it was inappropriate to send such text messages to

an emotionally troubled player." Wells Report at 47. The Report concludes: "We find that these

text messages to Martin demonstrated poor judgment on Coach Turner's part." *Id.*

Turner alleges that the Defendants omitted materially relevant information pertaining to

the context of these communications and that by doing so they "creat[ed] a false impression of

Turner's motivations for reaching out to Martin." Compl. ¶ 110. Turner contends that the Defend-

ants knew, but purposely ignored, that Martin and Incognito were close friends and that Turner

believed Martin did want to release a statement defending his friend but that a third party was advising (or directing) Martin not to do so. *Id.* ¶ 112. According to Turner, his messages to Martin "reflect not only a concern for Incognito's unfair treatment by the press but also his concern for Martin and his health, and for the other players who were being caught in the media frenzy." *Id.* ¶ 114.

**D.**     *Procedural History*

Turner filed suit in this Court on September 2, 2015. In his Complaint, he alleges three theories of defamation against Wells and Paul, Weiss: (1) defamation *per se*; (2) common law defamation based on actual malice, recklessness, or negligence; and (3) defamation by implication. The Defendants moved to dismiss the Complaint in its entirety on October 28, 2015. The motion was briefed, and the Court held oral argument on the motion on May 4, 2016.

## II.     LEGAL STANDARDS

**A.**     *Motion to Dismiss*

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709-10 (11th Cir. 2010). "[T]he pleadings are construed broadly," *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff, *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). At bottom, the question is not whether the

claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

## B. *Defamation*

The parties do not dispute that Florida law should govern the analysis of Turner's claims. Under Florida law, defamation is generally defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. 4th DCA 1973). To state a claim for common law defamation, a plaintiff must allege that "(1) the defendant published a false statement (2) about the plaintiff (3) to a third party and (4) that the falsity of the statement caused injury to the plaintiff." *Alan v. Wells Fargo Bank, N.A.*, 604 F. App'x 863, 865 (11th Cir. 2015) (per curiam) (quoting *Valencia v. Citibank Int'l*, 728 So. 2d 330, 330 (Fla. 3d DCA 1999)) (internal quotation marks omitted).

However, in a defamation per se action, the plaintiff does not need to show any special damages, *see Johnson v. Fin. Acceptance Co.*, 159 So. 364, 365 (Fla. 1935), because "[p]er se defamatory statements are 'so obviously defamatory' and 'damaging to reputation' that they 'give[] rise to an absolute presumption both of malice and damage," *Alan*, 604 F. App'x at 865 (quoting *Wolfson*, 273 So. 2d at 776). A written publication is defamatory per se if it "(1) charges that a person has committed an infamous crime; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." *Id.* (citing *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953)).

True statements, *i.e.*, statements that are not capable of being proved false, and statements of pure opinion are protected from defamation actions by the First Amendment. *See, e.g.*, *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 717 (11th Cir. 1985). Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court. *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006).

1.     **Falsity**

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984) (quoting *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983)) (internal quotation marks omitted); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 23 (1990) (Brennan, J., dissenting) ("I agree with the Court that . . . only statements that are capable of being proved false are subject to liability under state libel law."); *accord Fla. Med. Ctr., Inc. v. N.Y. Post Co.*, 568 So. 2d 454, 458 (Fla. 4th DCA 1990). Falsity exists only if "the publication is substantially and materially false, not just if it is technically false." *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 707 (Fla. 3d DCA 1999); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516 (1991) (explaining that a flawed assertion of fact is not actionable as long as it is "substantial[ly] tru[e]," because the common law of libel "overlooks minor inaccuracies"). The alleged false statement does not have to be "perfectly accurate" if the "gist" or the "sting" of the statement is true. *Id.* A "statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517 (citation and internal quotation marks omitted).

2.     **Pure Opinion**

A statement is pure opinion, as a matter of law, "if the speaker states the facts on which he bases his opinion." *Lipsig v. Ramlawi*, 760 So. 2d 170, 184 (Fla. 3d DCA 2000) (citing *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981) (holding that pure opinion occurs "when the defendant makes a comment or states an opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public")); *see also Razner v. Wellington Reg'l Med. Ctr., Inc.*, 837 So. 2d 437, 442 (Fla. 4th DCA 2002).

### 3.    Defamation by Implication

The Florida Supreme Court recently recognized the tort of defamation by implication. Under this theory, the defendant may be held responsible for a defamatory implication if the defendant "[1] juxtaposes a series of facts so as to imply a defamatory connection between them, or [2] creates a defamatory implication by omitting facts." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1106 (Fla. 2008) (citation and internal quotation marks omitted). Defamation by implication also "applies in circumstances where literally true statements are conveyed in such a way as to create a false impression." *Id.* at 1108.

That said, "[a]ll of the protections of defamation law that are afforded to . . . private defendants are . . . extended to the tort of defamation by implication." *Id.* Notably, if a defendant creates a defamatory implication by omitting facts—as Turner alleges here—that defendant "may be held responsible for the defamatory implication, ***unless it qualifies as an opinion***, even though the particular facts are correct." *Id.* (emphasis added). In other words, because the language specifically carves out an exception for opinions, if the Court determines that any of the Defendants' statements are in fact pure opinion, then the question of whether the Defendants created a defamatory implication by omitting facts from the Wells Report is irrelevant.

## III.   DISCUSSION

### A.    *Statements and Omissions Pertaining to the Blow-Up Doll Incident*

Turner challenges two statements in the Defendants' recitation of the blow-up doll incident: (1) that he "participated in the taunting" of Player 1, Wells Report at 20; and (2) that the incident was "part of a pattern of abusive, unprofessional behavior that ultimately undermined the offensive line and hurt the team," *id.* at 21. He argues that each of these statements is a false statement of fact. He also alleges that the Defendants defamed him by implication by omitting "crucial information" demonstrating that Turner "did not . . . participate in any taunting, that Player 1 did not

find anything Turner said or did to be abusive or offensive, and that Turner said or did nothing

which, by any objective standard, was abusive or offensive." Pl.'s Opp'n at 12.

### 1.    "Participated in the Taunting"

#### a.    *Pure Opinion, Despite Allegedly Omitted Facts*

It is well settled in Florida that "[c]ommentary or opinion based on facts that are set forth

in the article or which are otherwise known or available to the reader or listener are not the stuff

of libel." *Rasmussen v. Collier Cnty. Publ'g Co.*, 946 So. 2d 567, 571 (Fla. 2d DCA 2006) (citing

*Hay v. Indep. Newspapers, Inc.*, 450 So. 2d 293, 295 (Fla. 2d DCA 1984)). "An important factor

in the process of analyzing a comment is determining whether the speaker accurately presented

the underlying facts of the situation before making the allegedly defamatory remarks. Where the

speaker or writer presents the facts at the same time he or she offers independent commentary, a

finding of pure opinion will usually result." *Zambrano v. Devanesan*, 484 So. 2d 603, 606 (Fla.

4th DCA 1986).[2] In *Rasmussen*, for example, Florida's Second District Court of Appeal held that

editorials written in the *Naples Daily News* about the controversy surrounding suspicions of self-

dealing and public corruption in the failed construction of a golf resort in Naples were non-

actionable. The court found that the statements contained within those editorials were based on

facts disclosed either in the articles themselves or in the extensive coverage the newspaper had

afforded to the controversy. *Id.*; *see also Hay*, 450 So. 2d at 295 (holding that statements contained

in an article referring to the plaintiff as a "crook" and a "criminal" were based in part upon facts

---

[2]    The federal courts of appeal have continually and consistently held similarly. *See, e.g.*, *Piccone v. Bartels*, 785 F.3d 766 (1st Cir. 2015) (holding that the defendant "fully disclosed the non-defamatory facts about the confrontation in a way that allowed [a third party] to form his own impression. Accordingly, the district court correctly con-cluded that Defendant's statements regarding his impression of Plaintiffs' professionalism were not actionable under defamation law"); *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) ("Pure opinion is a statement of opinion which is accompanied by a recitation of the facts upon which it is based . . . ." (citation and internal quotation marks omitted)); *Koly v. Enney*, 269 F. App'x 861, 865 (11th Cir. 2008) (per curiam) ("[E]xpressions of 'pure' opinion (those based upon known or disclosed facts) are guaranteed virtually complete constitutional protection." (alteration in original) (citation and internal quotation marks omitted)).

14

disclosed in the article and in part upon the fact that criminal charges had been filed against the defendant, which was known by or readily available to the public).

Here, the facts upon which the Defendants relied in making the challenged statement were each laid out in the Report:

(1) During Player 1's time with the Dolphins, Incognito, Jerry, and Pouncey often called Player 1 homophobic slurs in a demeaning tone. Wells Report at 19.

(2) Incognito reportedly accused Player 1 of performing oral sex on men and urinating while sitting down. *Id.*

(3) Incognito reportedly asked Player 1, "[W]here's your boyfriend?" *Id.*

(4) Incognito acknowledged that Player 1 was spoken to in this matter "every day from everybody, high frequency." *Id.*

(5) Incognito and others admitted that Incognito, Jerry, and Pouncey routinely touched Player 1 in a mockingly suggestive manner, including on his rear end, while being taunted about his supposed homosexuality. *Id.*

(6) Turner was aware of the running "joke" that Player 1 was gay. *Id.* at 20.

(7) During the 2012 holiday season, Turner gave every offensive lineman ***except*** Player 1 a female blow-up doll as a gift. *Id.*

(8) Turner gave ***only*** Player 1 a male blow-up doll. *Id.*

(9) Incognito and others reported that this event transpired. *Id.*

(10) When interviewed, the Defendants asked Turner if he gave Player 1 a male blow-up doll. Turner replied, "I can't remember." *Id.*

The Report concludes, based on these outlined facts—none of which Turner disputes—that Player 1 was taunted by his teammates for being gay and that, in giving a male blow-up doll only to Player 1, Turner "participated in the taunting" of Player 1. *Id.* at 20.

Turner hones in on this phrase specifically, arguing that because he intended the gift of the male blow-up doll as a joke, the Defendants' assertion that he "participated in the taunting" is necessarily a false statement of fact. Turner, in essence, urges this Court to look at this phrase in a vacuum, uncoupled from the surrounding facts. But to make the determination of whether a statement is pure opinion, a court "must construe the statement in its totality, examining not merely a particular phrase or sentence, but all of the words used in the publication" and "must consider the

context in which the statement was published and accord weight to cautionary terms used by the person publishing the statement." *Hay*, 450 So. 2d at 295 (citing *Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781 (9th Cir. 1980), *cited with approval in From*, 400 So. 2d at 57). Examining the Wells Report in its entirety, the Court notes that it includes several overarching cautionary statements, each of which would inform any reasonable reader that the conclusions contained within were the Defendants' opinions: "The opinions set forth in the findings and conclusions below and elsewhere in the Report are our own"; "Many of the questions raised by Jonathan Martin's departure from the Dolphins are nuanced and complex, but the underlying facts are not subject to great dispute. In our opinion, the factual record supports the following findings"; and "The Report presents the independent opinions of Mr. Wells and his colleagues." Wells Report at 7, 9, 52.

Construing the entire section devoted to the treatment of Player 1 (contained on pages 19-22 of the Wells Report), including the blow-up doll incident, in its totality, it is obvious to the Court that the Defendants presented the facts regarding Player 1 and regarding Turner at the same time as they offered their independent commentary on those facts, which mandates the characterization of that commentary as pure opinion. *See Zambrano*, 484 So. 2d at 606; *see also Colodny v. Iverson, Yoakum, Papiano & Hatch*, 936 F. Supp. 917 (M.D. Fla. 1996) (finding, based on *From* and *Hay*, that a defendant's statement was opinion because it "relie[d] upon several paragraphs of detailed, disclosed factual assertions"). The conclusion that Turner "participated in the taunting" of Player 1 by gifting him and him alone a male blow-up doll flows directly and logically from the facts surrounding Player 1's treatment at the hands of his teammates and from the fact that Turner himself was aware of the "joke" that Player 1 was gay prior to purchasing the male blow-up doll as a gift, none of which Turner disputes. The Defendants discovered these facts over the course of a lengthy investigation and then recited them in a comprehensive fashion in the Report.

16

The notion that Turner, or any other reader for that matter, might well come to a different conclusion upon review on these facts does not make the Defendants' evaluation of Turner's acts anything other than opinion. *See Spelson v. CBS, Inc.*, 581 F. Supp. 1195, 1203 (N.D. Ill. 1984) (finding alleged defamatory statements nonactionable where the statements amounted to "no more than an expression of opinion and commentary gleaned from intensive investigations and stated facts"; the challenged news broadcasts, which were "only critical of [the plaintiff]'s acts," "clearly present[ed] the facts from which the opinions are derived and in so doing, allow for the possibility that an individual viewer could reach a different conclusion regarding . . . the subject of the investigation"), *aff'd*, 757 F.2d 1291 (7th Cir. 1985).

Turner also argues that the Defendants omitted several facts from this section of the Report: (1) Turner did not give Player 1 the male blow-up doll "as a taunt regarding supposed homosexuality but as a tongue-in-cheek play on the fact that Player 1 notoriously had little success with dating women," Pl.'s Opp'n at 12 (citing Compl. ¶ 85); (2) Player 1 described Turner as a "great coach," a "great man," and a "great father," *id.* (quoting Compl. ¶ 86); (3) Player 1 did not perceive Turner as participating in taunting or abusive conduct, "nor did anyone else (except perhaps Wells apparently)," *id.*; (4) Dolphins players and coaches "uniformly contended that the joking and taunting that occurred amongst Dolphins players and coaches was not pervasive, excessive or any different from what they had experienced in other football locker rooms," *id.* (citing Compl. ¶¶ 54, 59). Based on these omissions, Turner contends that the Defendants' recitation of facts was incomplete and their assessment of the facts was erroneous because it "presented the gag as a statement of fact that Turner engaged in derogatory conduct" and, thus, the conclusion drawn from these facts is not opinion. *Id.*

In making this contention, Turner relies on a statement, originally appearing in the Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, that "[e]ven if the speaker states the facts upon

which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." 497 U.S. 1, 18-19 (1990).[3] Turner, ignoring the context surrounding that statement, seems to argue that because the Defendants omitted the four facts recited above, *Milkovich* compels the conclusion that they necessarily implied a false statement of fact. This is far too broad a reading of *Milkovich*, as the critical question in that case was not whether a defendant omitted facts or stated facts incorrectly, but whether a published statement is objectively verifiable as true or false.

In *Milkovich*, the plaintiff, Milkovich, a high school wrestling coach, brought suit against a newspaper, arguing that the newspaper had defamed him in an "opinion column" in its sports section. The column contained the accusation that Milkovich had perjured himself in testimony to a state court concerning his role in an altercation at a wrestling meet between his team and an opposing team, after he had previously given conflicting testimony before the board of the Ohio High School Athletic Association (OHSAA). The challenged passage read, "Anyone who attended the meet . . . knows in his heart that Milkovich . . . lied at the hearing after . . . having given his solemn oath to tell the truth." *Id.* at 5. According to the Supreme Court, the statement implied a false assertion of fact, not because the newspaper omitted facts from the article, but rather because the article's "clear impact" was that Milkovich had lied, a connotation that was "sufficiently factual to be susceptible of being proved true or false." *Id.* at 21 (citation and internal quotation marks omitted); *see also id.* ("A determination whether petitioner lied in this instance can be made on a core of objective evidence by comparing, *inter alia*, petitioner's testimony before the OHSAA board with his subsequent testimony before the trial court."); *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1117 (9th Cir. 2003) (explaining that the logic behind *Milkovich*

---

[3]   The case from which Turner pulled this quote directly, *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1247 (M.D. Fla. 2007), cites *Milkovich* as the source for the quote; Turner omitted *Johnson*'s citation to *Milkovich* in his brief.

"is straightforward and unassailable: When a publisher prints an opinion but doesn't state the basis for it, the reader may infer a factual basis that doesn't exist. But when a publisher accurately discloses the facts on which he bases his opinion, the reader can gauge for himself whether the factual basis adequately supports the opinion." (citation omitted)).

The dispositive question in *Milkovich* was not, as Turner seems to argue, simply whether the author left out facts that may have painted the plaintiff in a more positive light, but rather "whether a reasonable factfinder could conclude that the statements in the . . . column imply an assertion that [he] perjured himself in a judicial proceeding," which itself is an objectively verifiable assertion. 497 U.S. at 21;[4] *cf. Backes v. Misko*, 486 S.W.3d 7, 14, 26-27 (Tex. Ct. App. 2015) (finding that the defendant's statements on an internet posting including "[h]as anyone ever known anyone with [the] disease/issue" of Munchausen-Syndrome-by-Proxy and "[i]f you have STRONG suspicions . . . to whom do you turn them over" were not protected expressions of opinion but were assertions of an objectively verifiable fact that was defamatory, *i.e.*, whether the plaintiff was committing medical child abuse); *Anxon v. Paxson Commc'ns Corp.*, 736 So. 2d 1209, 1211 (Fla. 4th DCA 1999) (reversing trial court's order of dismissal after holding that the defendants' statements during a radio talk show broadcast that the plaintiff was "a drug using homosexual prostitute who accompanied [a male third party] to a social function . . . in exchange for money"

---

[4]   A case from the D.C. Circuit, *Jankovic v. International Crisis Group*, 593 F.3d 22 (D.C. Cir. 2010), also provides a cogent example of the straightforward application of the *Milkovich* rule. There, in 2003, the defendant nonprofit organization released a report that addressed the deceleration of Serbian reforms that had initially been spurred by the assassination of the Serbian Prime Minister. The defendants asserted that the financial institution owned by the plaintiff (a Serbian businessman) had appeared on a list of frozen assets published by the U.S. Treasury Department **because of** support that the plaintiff had provided to the regime of former Serbian leader Slobodan Milosevic. The plaintiff alleged that the assertion that he supported Milosevic's regime was defamatory, arguing that the defendants had omitted from their report the fact that a presidential Executive Order mandated that all financial institutions organized or located in Serbia appear on that frozen assets list. As a result, the plaintiff's company would appear automatically on the frozen assets list **regardless of its relationship** to the Milosevic regime. Based on this omission, the court held that the defendant's proposition was not based on true facts that were accurately disclosed and therefore, under *Milkovich*, the proposition could not be classified as opinion because it "still impl[ied] a false assertion of fact." *Id.* at 28. Similar to *Milkovich*, the dispositive issue in *Jankovic* was that the defendant's assertion (that the plaintiff's company appeared on the frozen assets list because the plaintiff supported Milosevic) was **objectively verifiable** as true or false by reference to the Executive Order, not that the defendants' report merely omitted related facts.

were not "mere opinions" but rather objectively verifiable statements of fact).

By contrast, the Defendants' characterization of Turner giving the male blow-up doll to Player 1 as "participat[ion] in the taunting" of Player 1 is ***not objectively verifiable***. Whereas one can determine with resort to empirical proof whether a plaintiff perjured himself in a judicial proceeding, whether a governmental department reported a certain fact, whether a plaintiff was committing medical child abuse, or whether a plaintiff was a gay prostitute, the subjective assertion that Turner's purchase of the male blow-up doll for Player 1 constituted "participat[ion] in the taunting" of Player 1 is not "an articulation of an objectively verifiable event." *Milkovich*, 497 U.S. at 22 (citation and internal quotation marks omitted). Turner's allegation that he intended the male blow-up doll as a "gift" for Player 1 rather than a "taunt" is not capable of being proven true or false, because an individual's state of mind at a particular point in time "is not subject to empirical proof." *Keller*, 778 F.2d at 718. Irrespective of whether the Defendants omitted certain facts from the Report, *Milkovich* does not disturb the Court's conclusion that this statement was the Defendants' opinion.

### b.      *No "Positive Light" Facts Required*

The Defendants are not required, as Turner argues, to have included facts in the Report that would have painted Turner in a more positive light because the facts they did include were truthfully and accurately reported, and the omitted facts did not create a defamatory implication. In *Janklow v. Newsweek, Inc.*, 759 F.2d 644 (8th Cir. 1985) (*Janklow I*), *aff'd on reh'g en banc*, 788 F.2d 1300 (8th Cir. 1986) (en banc) (*Janklow II*), a seminal case on this issue, the Eighth Circuit held that an article about a fourteen-year-old rape allegation against the plaintiff (the governor of South Dakota) was not actionable. The plaintiff did not dispute as false the basic facts reported by the defendant concerning the alleged rape: a young girl had made an allegation against him, federal officials had found insufficient evidence to prosecute, and several years later an Indian tribal

court disbarred him on the basis of that allegation. He claimed, however, that he was defamed by the omission of several favorable facts from the article, including that he had passed a lie detector test and that federal authorities had called the rape allegations unfounded. *Id.* at 647-48. The court rejected the plaintiff's defamation claim as he had asked the court "to hold Newsweek liable for omission of those additional facts that he believes should have been published, but whose omission did not make what was published untrue." *Id.* at 648; *see also Janklow II*, 788 F.2d at 1306 ("Courts must be slow to intrude into the area of editorial judgment, not only with respect to choices of words, but also with respect to inclusions in or omissions from news stories. Accounts of past events are always selective, and under the First Amendment the decision of what to select must almost always be left to writers and editors. It is not the business of government.").

Although the *Janklow* litigation dealt specifically with claims of defamation against a magazine, its teachings are no less applicable here. A publisher need not include facts in a report simply because they reflect favorably on a subject; nor should that publisher feel coerced into including such facts out of fear of a defamation lawsuit. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 261 (1974) (White, J., concurring) ("[It is an] elementary First Amendment proposition that government may not force a newspaper to print copy which, in its journalistic discretion, it chooses to leave on the newsroom floor."). As long as the facts that a defendant reports are truthfully presented and he did not omit facts so as to create a defamatory implication, the court's inquiry should go no further. *Compare, e.g., Martin v. Hearst Corp.*, 777 F.3d 546, 553 (2d Cir. 2015) ("Reporting [the plaintiff]'s arrest without an update may not be as complete a story as [she] would like, but it implies nothing false about her. Accordingly, we reject [the plaintiff]'s contention that the reports of her arrest are defamatory because they fail to mention that the case against her was eventually nolled."), *with, e.g., Gottwald v. Bellamy*, No. 11-0447, 2011 WL 2446856, at *2-3 (M.D. Fla. June 15, 2011) (finding that the plaintiff stated a claim for defamation by impli-

cation where statements on the defendants' website listing prior cases in which the plaintiff was accused of copyright infringement "strongly impl[ied]" that evidence of a pattern of copyright infringement by the plaintiff existed "because the website omit[ted] the facts that the plaintiffs in those cases public[ly] stated that [the plaintiff] did not infringe their songs").

Let us not forget, the Wells Report concerned workplace misconduct in the Miami Dolphins organization, especially as it related to the departure of Jonathan Martin from the team. It was not a report on Turner. The Defendants used their discretion in deciding not to include facts they deemed not relevant to their investigation or its conclusions, including Turner's statements about other teams' locker rooms, Player 1's statement that he viewed the male blow-up doll as a "joke," or Player 1's opinions of Turner as a coach or father. *See Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 412 (6th Cir. 1991) ("[Publishers] have no legal obligation to present a balanced view of what led up to [the publicized event]."). The law of defamation is concerned with whether a publisher reports a story ***truthfully***, not generously.

In sum, the Court finds that the Defendants' conclusion that Turner participated in the taunting of Player 1 by giving him a male blow-up doll is pure opinion that is not capable of being proven true or false, and is thus not actionable as defamation.

### 2.    "Abusive, Unprofessional Behavior"

The Court finds no merit in Turner's allegation that the Defendants' conclusion that the blow-up doll incident was part of a "pattern of abusive, unprofessional behavior" is a false statement of fact. Numerous courts have held in various circumstances that a defendant's characterization of a plaintiff's actions as "unprofessional" is nonactionable pure opinion. *See, e.g.*, *Varughese v. Mt. Sinai Med. Ctr.*, No. 12-8812, 2015 WL 1499618, at *74 (S.D.N.Y. Mar. 27, 2015) ("What [the plaintiff] objects to are the characterizations of her work as 'unsatisfactory,' 'unprofessional' and 'substandard.' But these are matters of ***opinion***, not actionable assertions of fact." (emphasis in

original)); *Freiburger v. Timmerman*, No. 13-8174, 2014 WL 5423068, at *5 (N.D. Ill. Oct. 23, 2014) (statement that a counter-plaintiff "has handled [the situation] in an extremely unprofessional manner" was an opinion that could not give rise to a defamation claim); *Piccone v. Bartels*, 40 F. Supp. 3d 198, 210 (D. Mass. 2014) (statement that the plaintiffs were "unprofessional" was "un-ambiguously [an] expression[] of opinion"), *aff'd*, 785 F.3d 766 (1st Cir. 2015); *Kiehn v. Stein*, No. 12-6554, 2013 WL 1789718, at *3 (N.D. Cal. Apr. 26, 2013) ("'[E]xtremely inappropriate' and 'unprofessional' are expressions of opinion, and thus not actionable [as defamation]."), *appeal filed*, No. 14-15104 (9th Cir. Jan. 13, 2014); *Manjarres v. Nalco Co.*, No. 09-4689, 2010 WL 918072, at *3-4 (N.D. Ill. Mar. 9, 2010) (finding that the defendants' alleged statements that the plaintiff was "unprofessional" and "incompetent" were "nonactionable opinions").

While the Defendants' statement that Turner's behavior, along with the behavior of several other players and coaches, was unprofessional "might not reflect the same conclusion that other individuals would reach when considering [the plaintiff]'s behavior, . . . they are clearly not provably false." *Hupp v. Sasser*, 490 S.E.2d 880, 887 (W. Va. 1997) (per curiam). Turner has not offered any support for his contention that the Defendants' statement that his behavior was "un-professional" is a false statement of fact. In light of this, the Court joins these courts from across the country in concluding that such statements are nonactionable opinion.

Furthermore, the Defendants' characterization of the various taunting incidents as "abusive . . . behavior" is also pure opinion. The Defendants disclosed true facts at the same time they provided their independent commentary on the incident, and their judgment that the blow-up doll incident, along with the other incidents, was "abusive" is not an objectively verifiable state-ment. *See Glaze v. Marcus*, 729 P.2d 342, 344 (Ct. App. Ariz. 1986) (finding defendant's state-ment that plaintiff's behavior was "unprofessional, insubordinate and abusive" was pure opinion).

\*   \*   \*

23

Accordingly, the Defendants' motion to dismiss Turner's defamation claims, to the extent those claims rely on any of the statements or omissions in the Wells Report surrounding the blow-up doll incident, is granted.

**B.**     ***Statements and Omissions Pertaining to the "Judas Code"***

**1.**     **No False Statements of Fact**

In his Complaint, Turner alleges that the Wells Report falsely states that he "establish[ed] a 'Judas Code'" and that "this fictional 'code' prevented Martin from reporting the 'abuse' to which he was allegedly subjected by his teammates." Compl. ¶¶ 91-92. Regarding the fine system, the Report states, in relevant part:

> The NFL permits players to establish so-called "kangaroo courts" under certain conditions; for example, any money they collect must be put to a common team-oriented purpose, such as a post-season party. Around the beginning of the 2013 season, ***the Dolphins offensive linemen established such a system***, and began to impose fines on each other for a variety of trivial offenses . . . . Incognito and Pouncey, as the leaders on the line, imposed many of the fines, but other linemen also proposed penalties. The fine book was often maintained by Incognito . . . .
>
> Sometimes, a fine would be levied on a lineman for acting like a "Judas," meaning a traitor or snitch. For example, if Coach Turner, while watching game footage, criticized a lineman for missing an assignment, and that player pointed out that his teammate was actually at fault, that player might be labeled a "Judas," which could result in a fine. Multiple offensive linemen were familiar with the "Judas" concept and told us that it had been referenced in discussions with Coach Turner. When we interviewed Turner, however, he denied knowing what the term "Judas" meant in the context of the Dolphins offensive line. He said, "I've never heard 'Judas fine' in my room," and denied hearing any other references to "Judas" in the offensive line room. He also denied lecturing players on the meaning of the term. The evidence shows, however, that Turner was aware of the "Judas" concept, and that he discussed its meaning with a number of linemen, even explaining how the biblical Judas had betrayed Jesus Christ and so became a "snitch." Further, Coach Mosley informed us that it had been Turner who introduced the idea of the "Judas fine" to the offensive linemen.

Wells Report at 121-22 (emphasis added). Regarding Martin, it states:

> Martin interpreted the "Judas fines" concept as confirming that "snitching" was contrary to the team ethic. He said that it discouraged him from complaining to anyone in the Dolphins organization about the conduct of his teammates. . . .
>
> We accept that the fear of being labeled a "snitch" or a "Judas" played a role in

24

> Martin's decision not to report abuse from his teammates. Martin believed that going to his coaches or other authority figures meant risking ostracism or even retaliation from his fellow teammates.

*Id.* at 122, 38.

The Court finds there is no false statement of fact here to support a claim of defamation. Although courts are directed to accept a plaintiff's allegations as true in ruling on a motion to dismiss, they are "***not bound*** to accept the truth of general allegations in a complaint where they are contradicted by specific factual details in attached exhibits." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 707 (11th Cir. 2016) (emphasis added). Turner's allegation that the Defendants falsely stated that he "established" the Judas Code is directly contradicted by the Report, which states explicitly that the NFL permits ***players***, not coaches, to establish these fine systems and that the Dolphins ***players***, not Turner, "established such a system" in 2013 and used it, *inter alia*, to punish other players who broke the "rule" regarding snitching. Wells Report at 121; *see also id.* at 37 ("The Dolphins offensive line enforced this general prohibition [against snitching] with ***their own peculiar rule***—the so-called 'Judas' code, which was buttressed by the imposition of fines." (citation omitted)). His argument that the Defendants "inserted" an "unsubstantiated conjecture" in the Report that Turner "operated the fine system," Pl.'s Opp'n at 14, also falls flat, given that the Report makes no claim that Turner operated or maintained the fine system and actually states that Incognito and Pouncey imposed many of the fines and that Incognito maintained the record of fines imposed.

Moreover, Turner's allegation that the Defendants falsely stated that the Judas Code "prevented" Martin from reporting the abuse is likewise directly contradicted by the Report, which states that Martin believed that "snitching" was contrary to the team ethic and that being labeled a "snitch" or a "Judas" played a role in Martin's decision not to report abuse. Wells Report at 122, 38; *see also id.* at 37 ("Martin claimed that there is a general code in football against 'snitch-

ing' on fellow players and that he did his best to honor that rule."). It is clear from the Report that the Defendants credit Martin's fear of being labeled as a snitch as contributing to his failure to report the abuse to his coaches, not that the Judas Code prevented him from doing so.

### 2.    No Defamation by Implication through Juxtaposition of Facts

Turner also contends that the Defendants "falsely juxtapose[ed] facts about Turner's occasional use of the term 'Judas' with the offensive line's fine system," which resulted in the defamatory implication that Turner "created and emphasized a 'Judas code' against snitching and, further, that it was an important factor in Martin not being forthcoming with the Team about his sensitivities." Pl.'s Opp'n at 14.[5] But Turner provides no authority to support his argument that the Defendants strategically juxtaposed facts to defame him by reporting (1) that Turner was aware of the player-created fine system, (2) that he had occasionally used the word "Judas," (3) that Martin interpreted the concept of "Judas fines" as confirming that the team discouraged snitching, and (4) that Martin was in part discouraged from complaining about his teammates' conduct based on fear of being labeled a snitch.

A review of applicable case law establishes that claims based on a false juxtaposition of facts must rely on more than a "tortured and extreme" reading of select facts, *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1477 (S.D. Fla. 1987) (citing *Valentine v. CBS, Inc.*, 698 F.2d 430, 432 (11th Cir. 1983)), and must depend on "a reasonable person's perception of the entirety of a publication and not merely on individual statements," *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). First, in *Crane v. Arizona Republic*, 972 F.2d 1511 (9th Cir. 1992), a newspaper published an article about an ongoing investigation by a congressional committee and the Department of Justice into alleged corruption by plaintiffs Henderson and Crane, the then-

---

[5]   Turner admits in the Complaint that he did occasionally used the word "Judas" in coaching the offensive line "to describe situations in which one of his players transferred responsibility for an on-field error to another player." Compl. ¶ 96.

current and former heads of the Justice Department's Los Angeles Organized Crime and Racketeering Strike Force, respectively. The allegations that spawned this investigation originated from an incarcerated felon enrolled in the federal witness protection program named Jerry Vann, who had previously served as a witness in numerous successful Strike Force investigations and prosecutions. The relevant portion of the article read as follows:

> Crane said he and Henderson talked about the allegations, the House request for an investigation and the Justice Department probe of them. He said Henderson told him Van[n] is "a kook."
>
> Henderson, however, told *The Republic* he was not aware that specific allegations have been made against him, Crane or the strike force, that he had not talked to Crane about them and that he did not know that the House committee had requested an investigation by the Justice Department.
>
> "This is all news to me," he said.

*Id.* at 1522. The newspaper did not dispute that the inconsistency in these statements was attributable to the fact that the reporter spoke with Henderson nearly two months before he spoke with Crane, and Henderson and Crane had conferred in the interim. The Ninth Circuit agreed with the plaintiffs that, by juxtaposing the statements in this way, placing a discussion of the later interview prior to the discussion of the earlier interview, while providing no explanation for the direct contradiction between the two individuals' statements, the newspaper "falsely conveyed the message that either Crane or Henderson lied to the reporter." *Id.*

Second, in *McBride v. Merrell Dow & Pharmaceuticals Inc.*, 717 F.2d 1460, 1465 (D.C. Cir. 1983), the plaintiff, Dr. William McBride, a research physician with expertise in the study of congenital abnormalities, testified as an expert witness in a highly publicized civil lawsuit in which the plaintiffs sued Merrell Dow alleging that the anti-nausea medication Bendectin caused birth defects. In light of the early controversy over Bendectin, the FDA held hearings in September 1980, during which they heard testimony from four of the expert witnesses, including McBride, who had testified for the plaintiffs in the civil suit. An article in *Science* magazine entitled "How

Safe Is Bendectin?" discussed the hearings and included the following passage:

> [The experts'] data, said scientists who attended the meeting, were hardly con-vincing. [An] FDA panel member . . . said that "As far as I'm concerned, the purpose of the hearing was to objectively view the scientific data. None of these people brought anything other than special pleading."

> These expert witnesses included William McBride . . . who was paid $5,000 a day to testify in Orlando. In contrast, [Merrell Dow] pays witnesses $250 to $500 a day, and the most it has ever paid is $1,000 a day.

*Id.* at 1462. The D.C. Circuit held that the juxtaposition of the true statement that McBride received $5000 per day for his expert testimony on behalf of the civil plaintiffs alongside the also-true statement that Merrell Dow paid a much lower amount for expert testimony could, sufficiently to withstand a motion to dismiss, support the implied defamatory meaning that the plaintiffs' case "was so weak they had to pay that much to get any expert to testify, and hence that Dr. McBride's testimony was for sale." *Id.* at 1465.

None of Turner's allegations regarding the Defendants' statements in the Wells Report vis-à-vis the fine system or the "Judas" concept even closely approximate the direct contradiction at issue in *Crane* or the stark juxtaposition of objectively true statements at issue in *McBride*. *See also, e.g.*, *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 948 (5th Cir. 1983) ("The basis of the libel lies in the juxtaposition of truthful statements about one company with truthful statements about the illegal operations of an independent company of the same name located in a different state."), *abrogation on other grounds recognized in Hiller v. Mfrs. Prod. Research Grp. of N. Am., Inc.*, 59 F.3d 1514 (5th Cir. 1995); *Shadle v. Nexstar Broad. Grp., Inc.*, No. 13-2169, 2014 WL 3590003, at *5 (M.D. Pa. July 21, 2014) (denying motion to dismiss where news broadcast's statements that viewers "looking to sell gold or silver" should "watch out for some scam artists out there," juxtaposed with its reporting that "detectives say [the plaintiff] operated his jewelry buying business without a license for more than a month" could give rise to the implication that the plaintiff not only allowed his license to lapse but that he also operated a "shady business").

"A statement is not defamatory unless the 'gist' or the 'sting' of the statement is defamatory." *Rubin*, 271 F.3d at 1306. And "[t]he gist of any statement within a publication . . . is found only by reference to the entire context." *Id.* The gist of the Wells Report is the findings and conclusions pertaining to Jonathan Martin's decision to leave the Miami Dolphins under allegations of bullying and harassment from his teammates. The Report's statements regarding the "Judas Code," boiled down, reflect that (1) the offensive line established a fine system; (2) the players fined each other for a wide variety of reasons; (3) a player might be called a "Judas" in Turner's presence and fined if he blamed another teammate for his on-field mistakes; (4) Turner occasionally used the term "Judas" in his coaching; (5) Martin interpreted the fact that players fined each other for "being a 'Judas'" as supporting his own conclusion that "snitching" on a teammate was looked down upon; and (6) Martin was, in part based on this interpretation, discouraged from reporting abuse to authority figures. Viewing this recitation of the fine system as a whole, it is clear that Turner puts undue emphasis on the fact that his name is included in the discussion of the system and alongside mentions of the "Judas" term. *See* Wells Report at 121.[6] No reasonable person's perception of the entirety of this discussion would be that the Defendants defamed Turner by juxtaposing facts. *See Turner*, 38 S.W.3d at 115.

The Court is hard-pressed to discern what arguably defamatory statement could ***reasonably*** follow from the facts about the fine system or the "Judas" concept. The Court does not accept Turner's "tortured and extreme" interpretation that the Defendants somehow implied that Turner "created," "established," or "emphasized" the fine system, in direct contradiction to the Report's actual text, which fully attributes the creation, establishment, and emphasis of the fine system to the Dolphins players. The same goes for Turner's interpretation that the Defendants implied that

---

[6]  A not-insignificant portion of that text is dedicated to a recitation of Turner's statements that he did not know what "Judas" meant, that he had never heard of "Judas fines," that he had never heard any references to "Judas," or that he never lectured players on the meaning of the term, each of which Turner contradicts in the Complaint. *See* Compl. ¶¶ 96-99.

he imposed fines for snitching, as the Report makes clear that only the ***players*** imposed fines, or that he established a "Judas Code" against snitching, as the Report specifically states that ***Martin*** believed that the rule against snitching was a "general code" that operated throughout professional football.

Finally, Turner argues that the Defendants, "[i]n referencing the 'Judas Code' . . . , omitted pertinent information," namely, that he reached out to Martin following Martin's failure to attend team workouts in May 2013, encouraged Martin to explain what bothered him, and brought Martin's struggles to management's attention. Pl.'s Opp'n at 15. It is confusing what precisely this "omitted pertinent information" has to do at all with the Defendants' discussion of the fine system, but, regardless, as Turner admits in the same sentence of his brief, the Defendants included each of these facts in the Report. *Id.* Turner's contention that defamation is somehow implied by the fact that the Defendants, as he puts it, "grudgingly placed" these facts "in other, unrelated sections of the Report," is specious at best. *Id.* The Defendants thoroughly outlined each of Turner's claimed "omitted" facts fewer than ten pages prior to their discussion of the fine system.[7] Turner does not

---

[7]   The passage, in full, reads as follows:

> On Monday and Tuesday, May 6 and 7, Martin stayed home and did not report to voluntary off-season workouts. ***As a result, Coach Turner reached out to him***, and on May 7, Martin agreed to meet with Turner at the Dolphins training facility. Martin and Turner provided largely similar accounts of this meeting.

> Martin said that at the outset, he told Coach Turner that he was upset and that he was thinking about whether he should leave football. At first Martin was relatively tight-lipped and vague, attributing his absence to unspecified personal issues, but ***Turner pressed him, believing that something was seriously wrong***. Specifically, ***Turner asked if Martin was experiencing suicidal thoughts***, and Martin responded by describing to Coach Turner his contemplation of suicide in January.

> Martin then began to open up, telling Turner about his history of self-diagnosed depression. In response, ***Turner told Martin that he should not take football so seriously, and he encouraged Martin to be happy that he was making a lot of money. Turner also asked if Martin's mental state was related to being named starting left tackle, and he asked if Martin did not want to play football anymore.*** Martin said "no" to both questions. ***Turner probed other personal and family areas, but felt that Martin did not articulate a concrete reason for his depression.***

> According to Martin, he told Turner that he had anxiety about football in a general sense, but he intentionally did not tell Turner that he was depressed because of the treatment by his teammates and his inability to confront them, which he viewed as a personal flaw. When we asked Martin why he had not disclosed his view that he was being harassed by some of his teammates, Martin told us that his reluctance

get to dictate where in the Report the Defendants should have included positive statements about him. As stated above, "[t]he gist of any statement within a publication . . . is found only by reference to the entire context." *Rubin*, 271 F.3d at 1306. This Court will not look at only a few select passages on a few select pages of text that Turner believes supports his claim and ignore the broader context of the Report.

*   *   *

The Court concludes that none of the statements in the Wells Report regarding the fine system, the "Judas" concept, or Martin's decisions based thereon could give rise to any claim of defamation by Turner. As a result, the motion to dismiss the Complaint, to the extent it alleges claims based on these statements or omissions, is granted.

### C.     *Statements and Omissions Pertaining to Insulting Comments about Martin's Sister*

Turner next argues that the Defendants' conclusion that Turner heard insulting comments made to Martin about his sister and did not stop the behavior is defamatory. Turner contends that the Defendants "omitted facts relating to this 'finding' which would have totally undermined their false conclusion, thereby creating the false impression that Turner knew about inappropriate behavior but failed to do anything to stop it." Pl.'s Opp'n at 15. The Court disagrees.

On page 44 of the Report, under the header "*Coaches*," the Defendants wrote:

> Martin claimed that both of his offensive line coaches, Turner and Mosley, ***over-heard some of the raunchy comments*** about his sister . . . . According to both

---

to talk about his teammates' conduct stemmed from what he perceived to be a "code" in professional football that a player should not "snitch" on his teammates. He maintained that he was not fully candid with Coach Turner because he did not want to break this code and because he did not want to jeopardize his ability to continue to play football by revealing the current severity of his depression.

**Coach Turner promptly reported to Coach Philbin on his talk with Martin.** Martin then met with Coach Philbin and discussed his depression and related mental health issues. This conversation lasted approximately 20 to 30 minutes. Coach Philbin told Martin that the team would get him help. . . .

**[W]e commend Coach Turner—he took Martin's disappearance seriously, pushed Martin to discuss his depression and promptly reported the information to Coach Philbin.**

Wells Report at 112-15 (emphases added).

> Martin and Incognito, Turner neither joined nor criticized the harsh language. Also, both Martin and Incognito said they thought Turner was a good coach. . . . Ultimately, . . . both Martin and Incognito agreed that ***the bulk of the insulting comments were not made in front of Turner*** and Mosley, and both players were uncertain to what extent their coaches truly appreciated the nature of the conduct at issue.

Wells Report at 44 (emphasis added). On the ***next page***, and as part of this same "*Coaches*" section, the Defendants wrote:

> Based on the entire record, we find that Coaches Turner and Mosley were ***certainly aware of some of the insulting comments*** directed to Martin by Incognito, Jerry[,] and Pouncey, although we cannot determine the full extent of that awareness and whether they had any appreciation of how hurtful this language was to Martin. It is undisputed that these coaches never sought to stop the behavior.

*Id.* at 45 (emphasis added).

Turner argues that the Defendants knew that he "was not aware of most of what they deemed 'insulting comments' but failed to mention this fact when in the Report they criticized Turner for failing to do anything to stop them." Pl.'s Opp'n at 16 (quoting Wells Report at 44). The Court is baffled by Turner's argument. The Report clearly states that Turner was aware of only ***some*** of these comments based on Martin and Incognito's claims that Turner overheard some of the comments. Turner acknowledges that he was "not aware of most" of the comments, necessarily conceding that he was, in fact, aware of some of the comments. *Id.* Therefore, the Defendants omitted no facts which rendered the Report's findings about these comments defamatory.

Turner then reiterates his argument, previously advanced during the discussion of the blow-up doll incident, that the Defendants failed to note that former and current Dolphins players and coaches told the Defendants that the Dolphins locker room was the "exact same" as all other football locker rooms in which these players and coaches had been. Pl.'s Opp'n at 16 (citing Compl. ¶¶ 22, 54, 59, 105-06). But, just as before, this Court will not hold the Defendants "liable for omission of those additional facts that [the plaintiff] believes should have been published, but whose omission did not make what was published untrue." *Janklow I*, 759 F.2d at 648. The Defendants

used their discretion in deciding not to include facts they deemed not relevant to the investigation or conclusions regarding workplace misconduct in the Miami Dolphins organization. *See Perk*, 931 F.2d at 412. It is not the Court's place to interfere.

Turner's reliance on *Gottwald v. Bellamy*, No. 11-0447, 2011 WL 2446856 (M.D. Fla. June 15, 2011), in this context is misplaced. As previously mentioned, that case involved a publication by the defendants on their website that listed a "pattern" of previous copyright infringement cases against the plaintiff. But that publication also omitted the fact that the plaintiffs in those other cases had publicly stated that the *Gottwald* plaintiff did not infringe their songs. The defendants' implication that the plaintiff had previously infringed these copyrights was an objectively verifiable statement of fact, and the omitted facts directly disproved the defendants' implied false statement. *See id.* at *2-3. Here, Turner's allegation that the Defendants impliedly "viewed" him "as acting inappropriately" by taking no action after becoming aware of the insulting comments, Pl.'s Opp'n at 16, is nonactionable because the implication, even if true, is pure opinion. Accounts of the environment in other teams' locker rooms, which the Defendants rightfully chose not to include, cannot prove or disprove the Defendants' implied opinion that Turner acted inappropriately.

Accordingly, the motion to dismiss the Complaint, to the extent it brings claims based on these statements and omissions, is granted.

### D.   *Statements and Omissions Pertaining to Turner's Text Messages to Martin*

Finally, the Court turns to the statements and omissions regarding the text messages Turner sent to Martin in early November 2013.[8] The challenged statements in the Report read as follows:

> When he sent these messages, Turner knew that Martin had left the team unexpectedly, had hospitalized himself in connection with a mental health condition and that Martin had previously struggled with serious psychological problems and had contemplated suicide. We accept that Turner may have believed in good faith that Incognito was being unfairly attacked by the media, but he should have realized

---

[8]   This text message conversation has been reproduced in the factual recitation, *supra*, at subsection I.C.4.

that it was inappropriate to send such text messages to an emotionally troubled
player. We find that these text messages to Martin demonstrated poor judgment
on Coach Turner's part. . . .

Turner sent these text messages to Martin knowing that Martin had hospitalized
himself in connection with a mental health condition, and in the face of public
reports indicating that Martin's emotional condition may have been a reaction to
his teammates' bullying and abusive behavior.

Wells Report at 47, 135.

Turner sent text messages to Martin (who undisputedly he knew was "emotionally troubled"
at the time he departed the team, *id.* at 47) that told him to, *inter alia*, "DO THE RIGHT THING.
NOW.", and continued to send similar messages after Martin told him he was advised not to issue
a statement. The Defendants concluded that this behavior was "inappropriate" and "demonstrated
poor judgment." *Id.*

The Court previously found that the Defendants' conclusion that Turner's behavior pertain-
ing to the blow-up doll incident was "unprofessional" was pure opinion. *See supra* Section III.A.2.
For the same reasons discussed in that analysis, the Court finds that the Defendants' conclusion in
this context is also nonactionable pure opinion.

Turner again argues in this context, based ostensibly on *Milkovich*, that the Defendants
defamed him by implication, this time by "knowingly omit[ing]" facts regarding the "context of
Turner's communications to Martin." Pl.'s Opp'n at 17. But, as the Defendants accurately point
out, each of Turner's purportedly "omitted" facts actually appears in the Report.

First, Turner claims that the "Defendants omitted material facts from their discussion of
these text messages, including the extremely close relationship between Martin and Incognito,
described by several players as 'best friends.'" *Id.* (citing Compl. ¶ 68). But the Report directly
addresses Martin's friendship with Incognito. *See* Wells Report at 36 ("Martin agreed that he had
developed a friendship of sorts with Incognito."); *id.* at 88 ("An intriguing and central aspect of
the Martin/Incognito story is that they both agreed that they developed an increasingly close

34

friendship during the 2012 season."); *id.* at 89 ("[M]any of the Dolphins players told us that they thought Incognito was Martin's best friend on the team, that the two appeared inseparable, and that they had often been overheard in the locker room discussing recent social activities or making plans to spend time together after practice.").

Second, Turner argues that the Defendants omitted that he "understood that Martin was receiving pressure from others not to support Incognito and, in good faith, believed that Martin wanted to put out a statement supporting his friend. But the Defendants quoted the same text message from Martin that Turner himself quotes in this allegation: "Coach. I want to put out a statement. Believe me I do. This thing has become such a huge story somehow. But I've been advised not to… And I'm not supposed to text anyone either cuz last time I responded to a teammate (Richie) I was intentionally manipulated and the conversation was immediately forwarded to a reporter." Wells Report at 47.

And third, Turner asserts that the "Defendants also ignored in their discussion of the text messages that Turner had been proactive in trying to help Martin overcome his reticence to discuss his suicidal thoughts and to get the help he needed, and had acted unwaveringly to support and assist Martin. Turner clearly cared about Martin's mental health." Pl.'s Opp'n at 18. The Court has already reproduced in full the Report's recitation of these facts, *see supra* note 7 (quoting Wells Report at 112-15), including the Defendants' statement that they "commend[ed] Coach Turner" for "t[aking] Martin's disappearance seriously," for "push[ing] Martin to discuss his depression," and for "promptly report[ing] the information to Coach Philbin." Wells Report at 115.

To the extent Turner takes issue with the placement of these favorable facts, or argues that they should have been iterated or reiterated alongside the discussion of the text message conversation, that argument falls flat. The Court, as it must, has considered the full context in which the Defendants' statements regarding the text messages were made, which includes consideration of

the positive facts pertaining to Turner's concern for Martin's well-being, and not just Turner's cherry-picked passages. Upon this consideration, the Court's conclusion is unchanged: the Defendants' statements that Turner's behavior in this instance was "inappropriate" or "unprofessional" are nonactionable opinion. As a result, the motion to dismiss the Complaint, to the extent it brings claims based on these statements or omissions, is granted.

## IV.    CONCLUSION

The Court has addressed each of the Complaint's allegations of defamatory statements contained within the Wells Report and has concluded that none of the challenged statements are actionable as defamation. The Court has also concluded that no juxtaposition or omission of facts gives rise to a claim for defamation by implication. The Court therefore need not analyze the arguments regarding the Defendants' supposed mental state or whether their statements are protected by qualified privilege.

Accordingly, it is **ORDERED AND ADJUDGED** that the Defendants' Motion to Dismiss [ECF No. 25] is **GRANTED**. The Plaintiff's Complaint [ECF No. 1] is **DISMISSED WITH PREJUDICE**.

This action is **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 29th day of July, 2016.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE